**COMMISSION FOR LAWYER DISCIPLINE, Petitioner,**

v.

**Barry Robert BENTON, Respondent.**

No. 97–0228.

Supreme Court of Texas.

Argued Feb. 5, 1998.

Decided July 14, 1998.

Rehearing Overruled Dec. 31, 1998.

Daniel K. Hedges, Houston, Linda A. Acevedo, Austin, for Petitioner.

Barry R. Benton, Edmund K. Cyganiewicz, Brownsville, for Respondent.

PHILLIPS, Chief Justice, delivered the opinion of the Court as to Parts I, II, III, IV, V–A, V–B and V–E, in which HECHT, ENOCH, OWEN, ABBOTT and HANKINSON, Justices, joined, and an opinion as to Parts V–C, V–D, V–F and VI, in which ABBOTT and HANKINSON, Justices, joined, and announced the judgment of the Court.

This is a disciplinary action arising out of an attorney's letter attacking the integrity of jurors who rendered a verdict against his clients. The Commission for Lawyer Discipline of the State Bar of Texas charged the attorney with violating Rule 3.06(d) of the Texas Disciplinary Rules of Professional Conduct, which regulates lawyers' post-verdict communications with jurors. The trial court found that the attorney had violated Rule 3.06(d) and imposed a probated suspension. The court of appeals reversed on constitutional grounds and dismissed the action. 933 S.W.2d 784, 941 S.W.2d 229 (Seerden, C.J., concurring on motion for rehearing). We reverse the judgment of the court of appeals and remand the cause to the trial court for a new punishment hearing.

I

Respondent Barry Benton represented the plaintiffs in a personal injury action that was tried to a jury in October 1991. The jury found the defendant liable but awarded Benton's clients no damages. In February 1992, after the trial court had granted the plaintiffs' motion for new trial, Benton sent the following letter to all members of the jury, with a copy to his clients:

Re: Florentino and Mary Esther Salas vs. Rene and Rosemarie Abete

Dear [juror]

It has been over four months since you sat on the jury in the above-referenced case and returned a verdict that Mr. and Mrs. Florentino Salas suffered no damages as a result of the bike accident involving Mr. Salas and the Abete's dog.

I was so angry with your verdict that I could not talk with you after the trial. I could not believe that 12 allegedly, [*sic*] good people from Cameron County, who swore to return a verdict based on the evidence, could find that the Celestas were not damaged. The only evidence admitted at trial was that Mr. Salas was hurt. The Abete's lawyer, paid for by State Farm Insurance Company, admitted that Mr. Salas was injured. There was no evidence introduced that Mr. Salas was not injured. Yet by your answers, you found that Mr. Salas was not injured.

The only reason I can see as to why you ignored the evidence is that you were affected by the "Lawsuit Abuse" campaign in the Valley. Why else would a jury breach its oath to render a true verdict based on the evidence? I want to say that when you make a finding in a trial which is not based on the evidence you are perverting our civil justice system and hurting everyone in the community. Who knows, maybe someday you will need the aid of our civil justice system and it will be as corrupted for you as you made it for the Salases. The next time you think of government as crooked, remember your contribution to the corruption of good government. You knew Mr. Salas was injured, but swore that he was not.

Your cold and unfair conduct does not matter now. Judge Hester reviewed the evidence admitted at trial and decided that your verdict was obviously unjust and granted the Salases a new trial. The first trial now was nothing more than a waste of everyone's time and the county's money. The Salases and myself are very relieved that our justice system may still provide a fair resolution to their claim, despite your verdict.

If you wish to discuss anything in this letter, please feel free to contact me.

These facts came to the attention of the State Bar District Grievance Committee. The committee held an investigatory hearing and concluded that Benton had violated Rule 3.06(d), which provides:

After discharge of the jury from further consideration of a matter with which the lawyer was connected, the lawyer shall not

ask questions of or make comments to a member of that jury that are calculated merely to harass or embarrass the juror or to influence his actions in future jury service.

TEX. DISC. R. PROF. COND. 3.06(d).[1] Benton rejected the grievance committee's proposed agreed judgment of public reprimand and elected to have the complaint against him heard in district court rather than through an administrative proceeding. *See* TEX.R. DISC. P. 2.14.

Pursuant to Benton's election, the Commission for Lawyer Discipline filed a disciplinary petition in district court. *See* TEX.R. DISC. P. 3.01. Benton answered and after discovery moved for summary judgment. Although he admitted to violating Rule 3.06(d) by attempting to influence the discharged jurors' actions in future jury service, Benton argued that the rule was unconstitutional. In his first amended original answer, he argued that Rule 3.06(d) violated the United States and Texas Constitutions in that it violated his right to free speech, was overbroad and vague, and denied him equal protection of the law. The trial court accepted Benton's stipulation that he had violated the rule, but held an evidentiary hearing on punishment. *See* TEX.R. DISC. P. 3.10. The trial court rendered judgment suspending Benton from law practice for six months with the suspension fully probated for one year subject to the conditions that, among other things, he apologize to the jurors and perform community service.

Benton appealed on the same four constitutional grounds that he asserted in the trial court. The court of appeals reversed the trial court's judgment and dismissed the case on the sole ground that Rule 3.06(d) is void for vagueness. 933 S.W.2d 784. On rehearing, one justice issued a concurring opinion that disagreed with the majority's vagueness

holding but concluded that the rule is an unconstitutional limitation on speech. 941 S.W.2d 229. We granted the Commission's application for writ of error.

## II

■ Because the question of whether Rule 3.06(d) inhibits constitutionally protected speech will affect our analysis of Benton's vagueness challenge, *see Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 495 n. 7, 498, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982), we will begin by considering Benton's claim that the free speech guarantees of the federal and state constitutions prohibit the Commission from disciplining him for sending the letter. Of all the "truly difficult issues involving the First Amendment[,][p]erhaps foremost ... are cases that force us to reconcile our commitment to free speech with our commitment to other constitutional rights embodied in government proceedings." *Burson v. Freeman,* 504 U.S. 191, 198, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992) (opinion of Blackmun, J.) (discussing restrictions on campaign speech in the vicinity of polling places). This is such a case, because it requires us to resolve a conflict between the expressive rights of attorneys and the public's right to impartial jury trials—a right described in Texas's Declaration of Independence as "that palladium of civil liberty, and only safe guarantee for the life, liberty, and property of the citizen," and prominently enshrined in both constitutions. *See* U.S. CONST. amends. VI, VII; TEX. CONST. art. I, §§ 10, 15; *id.* art. V, § 10.

In determining whether Benton's speech is constitutionally protected, we must first decide what standard of scrutiny to apply to the disciplinary rule. Because the United States Supreme Court has recently addressed the application of the First Amendment to lawyers' speech, we will consider the appropriate

---

1. Rule 3.06(d) is taken with no substantive change from MODEL CODE OF PROFESSIONAL RESPONSIBILITY DR 7–108(D). Nineteen other states have substantially identical rules. *See* ALASKA R. PROF. COND. 3.10; CAL. R. PROF. COND. 5–320(D); GA CODE PROF. RESP. DR 7–108(D); HAW. R. PROF. COND. 3.5(e)(4)(i); ILL. R. PROF. COND. 3.5(d); IOWA CODE PROF. RESP. FOR LAWYERS DR 7–108(d); ME.CODE PROF. RESP. R. 3.7(f)(2); MD. R. PROF. COND. 3.5(a)(5); MASS. R. PROF. COND. 3.5(d); MINN. R. PROF. COND. 3.5(c); NEB.CODE PROF. RESP. DR 7–108(D); N.H.SUPER. CT. R. 77–B; N.Y.CODE PROF. RESP. DR 7–108(D); N.C. R. PROF. COND. 3.5(a)(5); OHIO CODE PROF. RESP. DR 7–108(D); OR.CODE PROF. RESP. DR 7–108(D); TENN.CODE PROF. RESP. DR 7–108(D); VT.CODE PROF. RESP. DR 7–108(D); VA. CODE PROF. RESP. DR 7–107(C).

standard under the federal constitution first. *See Operation Rescue–Nat'l v. Planned Parenthood,* 975 S.W.2d 546, 556, 41 Tex. Sup. Ct. J. 1071 (Tex.1998) (analyzing abortion protestors' federal free speech claim before Texas constitutional claim because United States Supreme Court had recently applied First Amendment in abortion protest context).

The Supreme Court's most recent pronouncement on the First Amendment standard applicable to lawyers' professional speech is *Gentile v. State Bar of Nevada,* 501 U.S. 1030, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991). Gentile, a criminal defense attorney, held a press conference on the day his client was indicted in which he stated that the prosecution's witnesses were framing his client as part of a cover-up of police corruption. He was given a private reprimand for violating a state bar rule that "[a] lawyer shall not make an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication if the lawyer knows or reasonably should know that it will have a *substantial likelihood of materially prejudicing an adjudicative proceeding.*" *Id.* at 1060, 111 S.Ct. 2720 (Appendix B to opinion of Kennedy, J.) (emphasis added) (quoting NEV. R. PROF. COND. 177(1) (amended 1991)). The Supreme Court held that the rule's "substantial likelihood of material prejudice" standard was sufficiently protective of lawyers' free speech rights to pass constitutional muster. *See id.* at 1075–76, 111 S.Ct. 2720 (opinion of Rehnquist, C.J.).[2] *But see id.* at 1034–37, 111 S.Ct. 2720 (opinion of Kennedy, J.) (urging application of "clear and present danger" standard).

*Gentile* acknowledged that when the speaker is a member of the press, the First Amendment does not allow the state to prohibit speech about a pending criminal case unless it shows a " 'clear and present danger' that a malfunction in the criminal justice system will be caused." *Id.* at 1071, 111 S.Ct. 2720 (opinion of Rehnquist, C.J.). The Court rejected the contention that the same high standard applies to restrictions on speech by attorneys involved in the pending case. *See id.* As officers of the court, lawyers voluntarily accept a "fiduciary responsibility" to the justice system and have "a duty to protect its integrity." *Id.* at 1074, 1076, 111 S.Ct. 2720 (opinion of Rehnquist, C.J.). "Membership in the bar is a privilege burdened with conditions." *Id.* at 1066, 111 S.Ct. 2720 (opinion of Rehnquist, C.J.) (quoting *In re Rouss,* 221 N.Y. 81, 116 N.E. 782, 783 (1917) (Cardozo, J.)). The degree of constitutional protection afforded to lawyers' speech varies according to context:

> Of course, a lawyer is a person and he too has a constitutional freedom of utterance and may exercise it to castigate courts and their administration of justice. But a lawyer actively participating in a trial ... is not merely a person and not even merely a lawyer.
>
> . . . .
>
> He is an intimate and trusted and essential part of the machinery of justice, an "officer of the court" in the most compelling sense.

*Id.* at 1072, 111 S.Ct. 2720 (opinion of Rehnquist, C.J.) (quoting *In re Sawyer,* 360 U.S. 622, 666, 668, 79 S.Ct. 1376, 3 L.Ed.2d 1473 (1959) (Frankfurter, J., dissenting)). Because lawyers participating in litigation "are key participants in the ... justice system, ... the State may demand some adherence to the precepts of that system in regulating their speech." *Id.* at 1074, 111 S.Ct. 2720 (opinion of Rehnquist, C.J.).

As is the case with most fiduciary positions, the privileged place attorneys hold in the justice system gives them a special capacity to harm that system. When lawyers connected to a pending case make remarks about that case, the public is far more likely to regard them as authoritative than other speakers. Lawyers not only have special expertise not shared by laypeople, but they have access to confidential information through discovery and client communications known only to them. *See id.* (opinion of Rehnquist, C.J.). Thus, such remarks have

---

**2.** Although some sections of the Chief Justice's opinion commanded the votes of only four members of the Court, Justice O'Connor joined in the sections concerning the First Amendment, making those sections a majority opinion. *See Gentile,* 501 U.S. at 1081–82, 111 S.Ct. 2720 (O'Connor, J., concurring).

enhanced potential to prejudice the pool of potential jurors. Moreover, the basic fact that our system gives lawyers the dominant role in the presentation of cases at trial gives them immense influence over how jurors decide those cases.

In light of attorneys' responsibilities and powers as officers of the court, *Gentile* held that the "substantial likelihood of material prejudice" standard set out in the Nevada disciplinary rule was consistent with the First Amendment. *Id.* at 1075, 111 S.Ct. 2720 (opinion of Rehnquist, C.J.). The Court did not adopt that standard as defining the outer limit on restrictions of lawyers' speech, but merely held that it was "constitutionally permissible." *Id.; see also id.* at 1082, 111 S.Ct. 2720 (O'Connor, J., concurring) ("[T]he 'substantial likelihood of material prejudice' standard articulated in Rule 177 passes constitutional muster."). Thus, *Gentile* left open the possibility that the "substantial likelihood of material prejudice" test may in fact give lawyers' speech more protection than the First Amendment requires. Because we are loathe to act on this possibility in the absence of a more definitive pronouncement from the Supreme Court, however, we will assume that the *Gentile* standard is a constitutional minimum.

The Supreme Court's discussion in *Gentile* focused on lawyers' public comments about pending cases in which they are involved, and expressly declined to decide whether a higher standard applies to the speech of lawyers who are strangers to the litigation. Although the First Amendment may well require more than a substantial likelihood of material prejudice when the lawyer is speaking as an individual citizen, this is not such a case. Rule 3.06(d) regulates only communication with jurors who heard a case with which the lawyer was connected. As in *Gentile*, the lawyer is a "key participant[ ] in the ... justice system" with respect to that case and those jurors. *Gentile*, 501 U.S. at 1074, 111 S.Ct. 2720 (opinion of Rehnquist, C.J.). The lawyer gained access to and influence over the jurors in his capacity as an officer of the court; his privileged position as a member of the bar made them his captive audience at trial. *Cf. Howell v. State Bar of Texas*, 843 F.2d 205, 208 (5th Cir.1988) ("[A]s an officer of the court, a lawyer can cause persons to drop their private affairs and be called as witnesses in court.... The license granted by the court requires members of the bar to conduct themselves in a manner compatible with the role of the courts in the administration of justice.") (quoting *In re Snyder*, 472 U.S. 634, 644–45, 105 S.Ct. 2874, 86 L.Ed.2d 504 (1985)). If the lawyer tries to continue exerting his influence over the jurors after they have completed their service, he cannot plausibly claim that he is doing so as an ordinary citizen. Under the rationale of *Gentile*, the "substantial likelihood of material prejudice" standard is sufficient protection for attorneys' speech in this context.

The Commission has offered an additional reason for applying a standard less strict than "clear and present danger" in this case: it asserts that Benton's speech is not political and is therefore outside the core of First Amendment protection. We reject this contention. "[S]peech concerning public affairs ... is the essence of self-government." *Burson*, 504 U.S. at 196, 112 S.Ct. 1846 (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74–75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964)). The Commission's brief states that "[i]t is an insult to the First Amendment" to categorize Benton's letter as political speech. But juries are part of our system of self-government, and criticism of the way in which jurors carry out their duties is undeniably speech concerning public affairs. Even when this speech is rude and insulting, as Benton's certainly was, it retains its political nature. *See Cohen v. California*, 403 U.S. 15, 25–26, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). Nor does the fact that the comments were made in a private letter rather than to a public audience prevent them from being political speech. *See Givhan v. Western Line Consolidated Sch. Dist.*, 439 U.S. 410, 415–16, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979). Except for Benton's special status as an attorney and his professional relationship to the addressees of the letter, we would apply the same rigorous standard ordinarily used for restrictions on political speech. *See Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). But *Gentile* applies even to political

speech. Four Justices described the lawyer's comments in that case, which like Benton's letter included allegations of government corruption, as "classic political speech," *Gentile,* 501 U.S. at 1034, 111 S.Ct. 2720 (opinion of Kennedy, J.), and the rest of the Court did not disagree.

Under the *Gentile* standard, the application of Rule 3.06(d) to Benton's letter does not violate the First Amendment because the letter created a substantial likelihood of material prejudice to the administration of justice. Benton asserts that post-verdict juror communications, unlike the pretrial publicity in *Gentile,* do not threaten the right to a fair trial because the jurors have already rendered their verdict. This analysis of the interest at stake is far too cribbed. *Gentile* stated that "[f]ew, if any, interests under the Constitution are more fundamental than the right to a fair trial by 'impartial' jurors, and an outcome affected by extrajudicial statements would violate that fundamental right." *Gentile,* 501 U.S. at 1075, 111 S.Ct. 2720 (opinion of Rehnquist, C.J.). Because of the facts involved in that case, *Gentile* focused on the effect that attorneys' pretrial statements can have on this interest. But it is well established in the law that post-verdict speech can also pose a sufficiently significant threat to the fairness of jury trials to justify curtailing the would-be speakers' constitutional interests.

For example, in *Haeberle v. Texas International Airlines,* 739 F.2d 1019 (5th Cir. 1984), the court rejected a First Amendment challenge to a local rule that prohibited lawyers from questioning discharged jurors about their verdict. The lawyers in *Haeberle,* having lost a jury trial, sought permission to interview the jurors to learn why their presentation of the case had not been persuasive. *See id.* The court upheld the local rule, citing the need "to protect [judicial] processes from prejudicial outside interferences," *id.* at 1022 (quoting *Sheppard v. Maxwell,* 384 U.S. 333, 362, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966)), and "the jurors' interest in privacy and the public's interest in well-administered justice," *id.*

Courts have used the same reasoning to uphold restrictions on post-verdict questioning of jurors against a variety of constitutional challenges by criminal defendants and civil litigants. In *Tanner v. United States,* 483 U.S. 107, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987), the Supreme Court rejected a Sixth Amendment challenge to Federal Rule of Evidence 606(b), which bars discharged jurors from testifying about most forms of jury misconduct. The Court concluded that the government's interest in preserving "full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople," *id.* at 120–21, 107 S.Ct. 2739, outweighed the possible infringement of defendants' Sixth Amendment rights. *See also Soliz v. Saenz,* 779 S.W.2d 929, 934–35 (Tex.App.—Corpus Christi 1989, writ denied) (holding that Texas Rule of Civil Evidence 606(b) did not deprive civil litigants of due process or trial by jury, but protected "purity and efficiency" of jury system as required by TEX. CONST. art. I, § 15).

Protecting the integrity of the jury system has even led courts to permit some restrictions on the press's First Amendment right to gather news. In *United States v. Cleveland,* 128 F.3d 267 (5th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1518, 140 L.Ed.2d 670 (1998), the Fifth Circuit rejected a newspaper's First Amendment challenge to an order requiring all persons to obtain court permission before interviewing the discharged jurors in a high-profile government corruption case about their deliberations and verdict. Because "[f]reedom of debate might be stifled and independence of thought checked if jurors were made to feel that their arguments and ballots were to be freely published to the world," *id.* at 270 (quoting *Clark v. United States,* 289 U.S. 1, 13, 53 S.Ct. 465, 77 L.Ed. 993 (1933)), the court concluded that the First Amendment permitted the order as a narrowly tailored protection against "the danger ... that compromises of the secrecy of jury deliberations presents [*sic* ] to our criminal justice system's reliance on jury determinations." *Id.*

These cases establish the principle that the constitutional rights of parties and the media to communicate with discharged

jurors for various purposes must sometimes yield to the competing constitutional interest in preventing damage to the jury system. Like Rule 3.06(d), these and related cases specifically recognize that the state's interest in protecting the jury system includes preventing post-verdict juror harassment. *See Tanner*, 483 U.S. at 120, 107 S.Ct. 2739 (quoting *McDonald*, 238 U.S. at 268, 35 S.Ct. 783); *United States v. Antar*, 38 F.3d 1348, 1363 (3d Cir.1994); *United States v. Kepreos*, 759 F.2d 961, 967 (1st Cir.1985); *United States v. Harrelson*, 713 F.2d 1114, 1116 (5th Cir.1983); *United States v. Moten*, 582 F.2d 654, 666 (2d Cir.1978). They recognize that impartial jury decisions may be endangered by events taking place after the jury has rendered its verdict, as well as before. If post-verdict interviews are permitted, the cases reason, that fact will become common knowledge among jurors, and the anticipation of such interviews will affect jurors' behavior in deliberations. *See Tanner*, 483 U.S. at 120–21, 107 S.Ct. 2739; *McDonald*, 238 U.S. at 267–68, 35 S.Ct. 783.

Texas's rules governing post-verdict contact with jurors are more permissive than the federal court rules and orders upheld in the cases above. We have long concluded that communication between parties, counsel, and discharged jurors can be a valuable experience for all concerned. In particular, a lawyer such as Benton who has lost at trial may respectfully ask the jurors to tell him why they were not persuaded by his case, and thus learn something that will help him serve his clients better in the future. Accordingly, Texas trial judges in civil cases are required to instruct jurors after the verdict that once they are discharged they are free to discuss the case with anyone, including the attorneys and parties, and that the attorneys may question them about their deliberations. *See*

TEX.R. CIV. P. 226a, Approved Instruction IV. But because we are aware that post-verdict communication carries dangers as well as benefits, we have adopted Rule 3.06 as a narrow prohibition on those questions and comments that tend to injure the jury system.

The abusive and insulting[3] comments in Benton's letter threatened to damage the jury system in at least two ways. First, the testimony at Benton's punishment hearing established that the letter discouraged jury service. One of the jurors to whom Benton sent the letter testified that although he had felt it was an honor to serve as a juror in the underlying personal injury case, he intended to express bias in future voir dire proceedings in order to avoid being chosen for jury service again. The sole reason for this change, he stated, was that he did not want to receive another letter like Benton's. Another juror's testimony illustrated the wide-ranging indirect impact a communication like Benton's can have on the jury system by affecting what discharged jurors tell potential future jurors about their service. That juror testified that she was formerly very involved in voter registration efforts, but that she stopped that activity after receiving Benton's letter because if people asked her about the possibility of being called for jury duty as a result of registering to vote, she would have to tell them about her negative experience with Benton and she felt it would cause them not to register.

Second, the fear of receiving abusive post-verdict communications like Benton's letter threatens to affect jurors' service while the trial is still in progress. Like the discouragement of jury service, this problem will affect both individuals who received Benton's letter when they are called for jury service again and other potential jurors who hear

---

**3.** We do not mean to suggest that discharged jurors' interest in freedom from insult, standing alone, would be grounds for punishing Benton's speech. The First Amendment does not permit government to ban speech because it is offensive to unwilling listeners unless the speech is intolerably intrusive, for example, if it invades the home or is directed at a captive audience. *See Erznoznik v. City of Jacksonville*, 422 U.S. 205, 209, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975). Rule 3.06(d), however, is concerned not with protecting jurors'

sensibilities as such, but with protecting the jury system from the harm that is likely to result from inappropriate attorney communications with discharged jurors. *Cf. Florida Bar v. Went for It, Inc.*, 515 U.S. 618, 631, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995) ("The Bar is concerned not with citizens' 'offense' in the abstract, ... but with the demonstrable detrimental effects that such 'offense' has on the profession it regulates.").

about Benton's conduct. Because a juror who has a personal interest in the outcome of the trial cannot be impartial, it is improper for a lawyer to tell jurors that they should vote a certain way in order to avoid facing a negative reaction from the community, *see Hendrix v. State,* 474 S.W.2d 230, 233 n. 1 (Tex.Crim.App.1971), or from a person involved in the case such as a crime victim, *see Carter v. State,* 650 S.W.2d 843, 847 (Tex. App.—Houston [14th Dist.] 1982), *aff'd on other grounds,* 650 S.W.2d 793 (Tex.Crim. App.1983). Similarly, the threat of verbal attacks by disappointed lawyers creates an atmosphere of intimidation during trial that can affect jurors' impartiality. An outcome affected by extrajudicial statements violates litigants' fundamental right to a fair trial. *See Gentile,* 501 U.S. at 1075, 111 S.Ct. 2720 (opinion of Rehnquist, C.J.); see *also* TEX. DISC. R. PROF. COND. 3.06 cmt. 1 ("To safeguard the impartiality that is essential to the judicial process, veniremen and jurors should be protected against extraneous influences."). This principle holds true even if the statements occurred in connection with another proceeding and their effect on the outcome is indirect.

Rule 3.06(d)'s prohibition on comments calculated "to influence [a discharged juror's] actions in future jury service" does not violate the First Amendment as applied to Benton for the same reasons. The letter seeks to influence the recipients' future jury service solely by attacking their performance as jurors in Benton's case. For example, Benton's own affidavit admitting that he intended the letter to influence the jurors specifically points to the statement, "I want to say that when you make a finding in a trial which is not based on the evidence you are perverting our civil justice system and hurting everyone in the community." No matter how laudable Benton's goal of persuading jurors to behave fairly in future cases, the state may legitimately prohibit him from couching this message in an assault on the juror's service in a case that he tried. Rather than influencing the recipient to perform well in future jury service, such comments are substantially likely to harm the jury system in the ways discussed above: influencing the juror, and others who hear about the letter, either to be subject to intimidation by lawyers in future jury service or to attempt to avoid service altogether. Thus, the application of this portion of the rule to Benton's speech is acceptable under *Gentile.*

■ In addition to his First Amendment claim, Benton asserts that the application of Rule 3.06(d) violates his right to free speech under Article I, Section 8 of the Texas Constitution, which provides in pertinent part: "Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press." This Court has recognized that "in some aspects our free speech provision is broader than the First Amendment." *Davenport v. Garcia,* 834 S.W.2d 4, 8 (Tex.1992). However, to assume automatically "that the state constitutional provision *must* be more protective than its federal counterpart illegitimizes any effort to determine state constitutional standards." *Operation Rescue,* 975 S.W.2d at 559. If the Texas Constitution is more protective of a particular type of speech, "it must be because of the text, history, and purpose of the provision." *Id.* We are aware of no textual or contextual reason to construe Article I, Section 8 as more protective than the First Amendment standard we apply today in the area of ethical restrictions on attorneys' professional speech. *See generally Ex parte Tucci,* 859 S.W.2d 1, 19–26 (Tex. 1993) (Phillips, C.J., concurring) (discussing history of Texas free expression clause).

The cases in which this Court has held the Texas Constitution to create a higher standard than the First Amendment have involved prior restraints in the form of court orders prohibiting or restricting speech. *See Ex parte Tucci,* 859 S.W.2d 1; *Davenport,* 834 S.W.2d 4. Our opinion in *Davenport* emphasized the literal text of our state constitutional guarantee in applying a heightened scrutiny to prior restraints.[4] Because of the

---

4. After our decisions in *Davenport* and *Tucci,* the United States Supreme Court clarified the First Amendment standard for reviewing injunctions against speech. *See Madsen v. Women's Health*

Texas provision's phrasing, "it has been and remains the preference of this court to sanction a speaker after, rather than before, the speech occurs." *Davenport,* 834 S.W.2d at 9; *see also Tucci,* 859 S.W.2d at 19–22, 27–28 (Phillips, C.J., concurring). As *Davenport* explained, "Responsibility for the abuse of the privilege is as fully emphasized by [Article I, Section 8's] language as that the privilege itself shall be free from all species of restraint.... Punishment for the abuse of the right, not prevention of its exercise, is what the provision contemplates." *Davenport,* 834 S.W.2d at 9 (quoting *Ex parte Tucker,* 110 Tex. 335, 220 S.W. 75, 76 (1920)). Rule 3.06(d) does not impose a prior restraint on speech, so the strict standard we applied in *Davenport* and *Tucci* is inapposite.

JUSTICE GONZALEZ argues that although "not a quintessential prior restraint," Rule 3.06(d) has the same effect as a prior restraint and should be judged by the same standard. 980 S.W.2d at 450. But Rule 3.06(d) is not comparable to the ordinance struck down as a de facto prior restraint in *Cox v. Louisiana,* 379 U.S. 536, 557–58, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965), as JUSTICE GONZALEZ suggests. *See* 980 S.W.2d at 451. The ordinance in *Cox* prohibited all obstructions of traffic, but was enforced only against persons who did not obtain advance permission from city officials for their parades and demonstrations. *See Cox,* 379 U.S. at 553, 555–56, 85 S.Ct. 453. This practice effectively "require[d] all who wish[ed] to disseminate ideas to present them first to police authorities for their consideration and approval." *Id.* at 557, 85 S.Ct. 453 (quoting *Schneider v. New Jersey,* 308 U.S. 147, 164, 60 S.Ct. 146, 84 L.Ed. 155 (1939)). By contrast, Rule 3.06(d) does not, either on its face or in practice, contemplate that lawyers should seek advance permission from the bar before communicating with discharged jurors.

JUSTICE GONZALEZ suggests that whenever a law fails to define with perfect clarity what speech it prohibits, it is tantamount to a prior restraint. *See* 980 S.W.2d at 448. This approach effectively eliminates the traditional distinction between prior restraints and other laws regulating speech. *See generally Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 559, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976) (discussing differences between laws imposing subsequent civil or criminal penalties on speech and prior restraints). The Supreme Court implicitly rejected the view that disciplinary rules limiting attorneys' speech are prior restraints when it held the federal constitutional standard for prior restraints on speech, set out in *Nebraska Press,* inapplicable in *Gentile. See Gentile,* 501 U.S. at 1065–76, 111 S.Ct. 2720. (opinion of Rehnquist, C.J.).

### III

Benton also argues that Rule 3.06(d) is unconstitutionally overbroad. An overbroad statute "sweeps within its scope a wide range of both protected and non-protected expressive activity." *Hobbs v. Thompson,* 448 F.2d 456, 460 (5th Cir.1971). When a statute prohibits speech or expressive conduct, the overbreadth doctrine allows a person whose own expression is unprotected to challenge the statute on the ground that it also prohibits protected speech. *See New York v. Ferber,* 458 U.S. 747, 768–69, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982). This is an exception to the general rule that a person to whom a statute may constitutionally be applied may not challenge the statute based on the possibility that it could be unconstitutional in other applications. *See id.* at 767–68, 102 S.Ct. 3348. Overbreadth challenges are permitted in the First Amendment context not for the benefit of the litigant, but for the benefit of society, to prevent the statute from chilling the constitutionally protected speech of other parties not before the court. *See Secretary of State v. Joseph H. Munson Co.,* 467 U.S. 947, 958, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984). A statute that is found to be overbroad may not be enforced at all, even against speech that could constitutionally be prohibited by a more narrowly drawn statute. *See Broadrick v. Oklahoma,* 413 U.S. 601, 613, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973).

*Ctr., Inc.,* 512 U.S. 753, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994). The level of protection for speech afforded by the *Madsen* standard is roughly equivalent to the tests we had articulated in those cases. *See Operation Rescue,* 975 S.W.2d at 556.

■ However, a statute will not be invalidated for overbreadth merely because it is possible to imagine some unconstitutional applications. *See Members of City Council v. Taxpayers for Vincent,* 466 U.S. 789, 800, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984). "Because of the wide-reaching effects of striking down a statute on its face at the request of one whose own conduct may be punished despite the First Amendment, we have recognized that the overbreadth doctrine is 'strong medicine' and have employed it with hesitation, and then 'only as a last resort.'" *Ferber,* 458 U.S. at 769, 102 S.Ct. 3348 (quoting *Broadrick,* 413 U.S. at 613, 93 S.Ct. 2908). Therefore, the Supreme Court has developed a requirement that the overbreadth must be "substantial" before the statute will be held unconstitutional on its face. *See Taxpayers for Vincent,* 466 U.S. at 800, 104 S.Ct. 2118. In other words, "there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *Id.* at 801, 104 S.Ct. 2118. Only if the statute "reaches a substantial amount of constitutionally protected conduct" may it be struck down for overbreadth. *City of Houston v. Hill,* 482 U.S. 451, 458, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987) (quoting *Village of Hoffman Estates,* 455 U.S. at 494, 102 S.Ct. 1186).

Rule 3.06(d)'s prohibition on comments calculated merely to harass or embarrass a former juror is not substantially overbroad. The Fifth Circuit has upheld restrictions on post-verdict communication more broadly worded than Rule 3.06(d) based on the possibility that the prohibited speech might lead to harassment. *See Haeberle,* 739 F.2d at 1021–22 (blanket ban on interviewing discharged jurors); *Harrelson,* 713 F.2d at 1118 (ban on "repeated requests" for interviews). Rather than prohibiting all communication, as in *Haeberle,* or using a potentially overinclusive proxy for harassment such as mere repetition, as in *Harrelson,* Rule 3.06(d) defines the prohibited speech in terms of the particular evil to be prevented: harassment and embarrassment of discharged jurors, which as we have discussed are by their nature substantially likely to damage our justice system. In addition, the rule prohib-

its only "questions of" or "comments to" discharged jurors; it does not prevent lawyers from speaking publicly about the jury's verdict. *See* TEX. DISC. R. PROF. COND. 3.06(d).

Nor is the rule's ban on comments calculated to influence discharged jurors' actions in future jury service substantially overbroad. Our discussion today has focused primarily on the dangers to the jury system from rude and abusive speech, but polite comments calculated to influence future actions in jury service may pose a substantial threat to the administration of justice in a different way. For example, such comments may damage the impartiality of the jury pool when they attempt to persuade jurors to favor a particular lawyer, firm, or side of the docket in future cases. Although we do not deny the possibility that the "influence" provision of Rule 3.6(d) may reach some constitutionally protected speech, a question we need not decide today, its impermissible applications are not "substantial . . . judged in relation to the [rule]'s plainly legitimate sweep." *Broadrick,* 413 U.S. at 615, 93 S.Ct. 2908.

Our holding that Rule 3.06(d) is not substantially overbroad does not foreclose lawyers who believe the rule violates the First Amendment as applied to them from challenging it. We simply conclude that "whatever overbreadth may exist should be cured through case-by-case analysis of the fact situations to which [the rule's] sanctions, assertedly, may not be applied." *Id.* at 615–16, 93 S.Ct. 2908.

## IV

■ Benton argues that applying a more permissive constitutional standard to restrictions on attorneys' speech than to restrictions on the speech of other persons violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Ordinarily, a law that treats different persons differently will survive an equal protection challenge as long as the distinction it makes rationally furthers a legitimate state purpose. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 54, 103 S.Ct. 948, 74 L.Ed.2d 794

(1983). The Constitution requires higher scrutiny only if the law discriminates against a suspect class or impinges on a fundamental right. *See Plyler v. Doe,* 457 U.S. 202, 216–17, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982). While lawyers are not by any stretch a suspect class, *see Giannini v. Real,* 911 F.2d 354, 359 (9th Cir.1990), speech is certainly a fundamental right, *see Plyler,* 457 U.S. at 217 & n. 15, 102 S.Ct. 2382. Benton may not expand his speech rights, however, simply by reurging them under a different constitutional provision. "We have rejected [his] contention when cast as a First Amendment argument, and it fares no better in equal protection garb." *Perry Educ. Ass'n,* 460 U.S. at 54, 103 S.Ct. 948; *see also* 4 ROTUNDA & NOWAK, TREATISE ON CONSTITUTIONAL LAW § 20.11 at 48–49 (2d ed. 1992) ("Whenever the Court finds that a classification violates the first amendment, it alternatively could rule that the classification violated equal protection.... If a statute ... does not conflict with first amendment principles, it almost certainly will be held not to violate equal protection....").

Benton also asserts that Rule 3.06(d) violates the equal protection guarantee of the Texas Constitution. *See* TEX. CONST. art. I, § 3 ("All free men, when they form a social compact, have equal rights, and no man, or set of men, is entitled to exclusive separate public emoluments, or privileges, but in consideration of public services."). Texas courts have generally followed federal equal protection jurisprudence in interpreting our own equal protection provision, *see Lucas v. United States,* 757 S.W.2d 687, 703–08 (Tex.1988) (Phillips, C.J., dissenting) (collecting cases), and Benton has not argued that we should apply a different standard under the Texas Constitution.

## V

### A

Benton's vagueness claim remains to be addressed. A statute which prohibits conduct that is not sufficiently defined is void for vagueness. *See Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). The vagueness doctrine is a component of the Constitution's due process guarantee. *See id.* A vague statute offends due process in two ways. First, it fails to give fair notice of what conduct may be punished, forcing people to guess at the statute's meaning, *see Coates v. City of Cincinnati,* 402 U.S. 611, 614, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971), and threatening to trap the innocent, *see Grayned,* 408 U.S. at 108, 92 S.Ct. 2294. Second, it invites arbitrary and discriminatory enforcement by failing to establish guidelines for those charged with enforcing the law, "allow[ing] policemen, prosecutors, and juries to pursue their personal predilections." *Smith v. Goguen,* 415 U.S. 566, 575, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974).

To survive a vagueness challenge, a statute need not spell out with perfect precision what conduct it forbids. "Words inevitably contain germs of uncertainty." *Broadrick,* 413 U.S. at 608, 93 S.Ct. 2908. Due process is satisfied if the prohibition is "set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with." *United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers,* 413 U.S. 548, 579, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973). Because we are concerned with whether an enactment gives "fair notice to those to whom [it] is directed," *Grayned,* 408 U.S. at 112, 92 S.Ct. 2294 (alteration in original) (citing *American Communications Ass'n v. Douds,* 339 U.S. 382, 412, 70 S.Ct. 674, 94 L.Ed. 925 (1950)), in scrutinizing a disciplinary rule directed solely at lawyers we ask whether the ordinary lawyer, with "the benefit of guidance provided by case law, court rules and the 'lore of the profession,'" could understand and comply with it. *Howell v. State Bar of Texas,* 843 F.2d 205, 208 (5th Cir.1988) (holding disciplinary rule forbidding "conduct that is prejudicial to the administration of justice" not unconstitutionally vague).

The vagueness doctrine requires different levels of clarity depending on the nature of the law in question. Courts demand less precision of statutes that impose only civil penalties than of criminal statutes because their consequences are less severe.

*See Village of Hoffman Estates,* 455 U.S. at 498, 102 S.Ct. 1186. Attorney disciplinary proceedings in Texas are civil, *see State Bar v. Evans,* 774 S.W.2d 656, 657 n. 1 (Tex.1989), so disciplinary rules need not satisfy the higher degree of specificity required of criminal statutes. *See State Bar v. Tinning,* 875 S.W.2d 403, 409 (Tex.App.—Corpus Christi 1994, writ denied). However, when the statute's language is capable of reaching protected speech or otherwise threatens to inhibit the exercise of constitutional rights, a stricter vagueness standard applies than when the statute regulates unprotected conduct. *See Village of Hoffman Estates,* 455 U.S. at 497, 102 S.Ct. 1186; *NAACP v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) ("Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity.").

■ In considering Benton's vagueness challenge to Rule 3.06(d), the court of appeals examined the language of the rule on its face. *See* 933 S.W.2d at 787–88. The Commission argues that Benton should have been required to show that the rule is vague as applied to him, because a person whose conduct is clearly prohibited by a statute cannot complain that the statute may be vague as applied to others. *See Village of Hoffman Estates,* 455 U.S. at 495, 102 S.Ct. 1186. In Benton's case, an as-applied vagueness argument would be doomed to failure because Benton stipulated that his letter to the jurors violated Rule 3.06(d)'s "influence" provision, so he cannot claim that the rule unconstitutionally failed to put him on notice that his conduct was prohibited. *Cf. Whiting v. Town of Westerly,* 942 F.2d 18, 22 (1st Cir.1991) (rejecting vagueness challenge to ban on sleeping in public by parties who "testified at trial that they engaged in precisely the activity prohibited by the ordinance").

■ The Commission fails to recognize that the general rule against facial vagueness challenges is relaxed when the assertedly vague statute has the potential to affect First Amendment freedoms. When speech is at stake, "[a]lthough a statute may be neither vague, overbroad, nor otherwise invalid as applied to the conduct charged against a particular defendant, he is permitted to raise its vagueness ... as applied to others.... This result is deemed justified since the otherwise continued existence of the statute in unnarrowed form would tend to suppress constitutionally protected rights." *Gooding v. Wilson,* 405 U.S. 518, 521, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972); *see also Kolender v. Lawson,* 461 U.S. 352, 358 & n. 8, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983); *Village of Hoffman Estates,* 455 U.S. at 495 n. 7, 102 S.Ct. 1186. We have determined that Rule 3.06(d) does not violate the First Amendment in Benton's case and does not reach a substantial amount of constitutionally protected speech. Nevertheless, like all laws regulating speech, it has the potential to chill some protected expression if it does not define what is prohibited with sufficient clarity. Accordingly, we will consider Benton's claim that the rule is void for vagueness on its face.

### B

■ We begin our vagueness review of Rule 3.06(d) by noting the significance of a term that the court of appeals and the parties appear to have overlooked: "calculated." This word modifies all three of the challenged verbs, "harass," "embarrass," and "influence." We have found no established definition of "calculated" in Texas law. One court has concluded, "The word 'calculated' ... may mean either likely or intended." *Pouchan v. Godeau,* 167 Cal. 692, 140 P. 952, 953 (1914). *Compare Burch v. Burch,* 195 F.2d 799, 811 (3d Cir.1952) (" '[C]alculated' as used in these statutes means 'likely to' rather than 'intended to' ...."), *with Soweco, Inc. v. Shell Oil Co.,* 617 F.2d 1178, 1191 (5th Cir. 1980) ("The ... phrase 'calculated to deceive' seems to suggest that there must be some intent...."). The official comment to Rule 3.06(d) supports the former interpretation: it states that a lawyer must not "mak[e] comments that *tend to* harass or embarrass ... or to influence." Tex. Disc. R. Prof. Cond. 3.06 cmt. 1 (emphasis added). It is consistent with the rule's purpose of protecting the jury system to construe it not only as prohibiting lawyers from intentionally causing forbidden effects such as harassment, but also

as requiring them to refrain from communications that are objectively likely to have those effects. In addition, the fact that three of the seventeen other states with disciplinary rules modeled on the same source as Rule 3.06(d) have replaced the word "calculated" with "intended" supports the conclusion that those terms are not synonymous.[5] We accordingly interpret the word "calculated" in this context as meaning that a lawyer must not make a communication which an ordinary reasonable lawyer would foresee is likely to harass, embarrass, or influence an ordinary juror. This construction of "calculated" measures both the lawyer's speech and the juror's reaction by an objective reasonableness standard.

While statutes that "d[o] not indicate upon whose sensitivity a violation ... depend[s]" are likely to run afoul of the vagueness doctrine, see Coates, 402 U.S. at 613, 91 S.Ct. 1686, a restriction banning only "what men of common intelligence would understand would be words likely to cause [harm]" is less objectionable. See id. at 613 n. 3, 91 S.Ct. 1686 (quoting Chaplinsky v. New Hampshire, 315 U.S. 568, 573, 62 S.Ct. 766, 86 L.Ed. 1031 (1942)). Defining the prohibited speech in terms of what effect an ordinary lawyer would expect the speech to have assuages the vagueness doctrine's concern with whether "men of common intelligence must necessarily guess at [the statute's] meaning." Id. at 614, 91 S.Ct. 1686. Similarly, it reduces the danger of arbitrary enforcement by guaranteeing that the line between compliance and violation does not simply "depend upon whether or not a policeman is annoyed," id., or in this case, whether a particular juror is harassed, embarrassed, or influenced. Thus, although the word "calculated" is by no means a silver bullet against vagueness, its objective reasonableness standard provides a measure of due process protection that is relevant to our vagueness analysis.

## C

Courts in other jurisdictions have disagreed on whether the term "harass" standing alone is clear enough to survive vagueness review. Compare State v. Martel, 273 Mont.

143, 902 P.2d 14, 19 (1995) (not vague), with State v. Bryan, 259 Kan. 143, 910 P.2d 212, 217–19 (1996) (vague). The court of appeals interpreted "harass" as equivalent to "annoy," which the Supreme Court held unconstitutionally vague in the context of a disorderly conduct ordinance in Coates v. City of Cincinnati, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971). See 933 S.W.2d at 787–88. Although in colloquial usage "harass" may sometimes have the same meaning and hence the same vagueness as "annoy," we are bound to construe it to avoid constitutional infirmity if possible. See Nootsie, Ltd. v. Williamson County Appraisal Dist., 925 S.W.2d 659, 662 (Tex.1996); see also Kramer v. Price, 712 F.2d 174, 178 & nn. 5–6 (5th Cir.1983) (discussing use of limiting constructions to save statutes from vagueness).

The vagueness of a word like "annoy" comes from the fact that "[c]onduct that annoys some people does not annoy others," Coates, 402 U.S. at 614, 91 S.Ct. 1686, so that potential defendants do not know what they must do to avoid breaking the law and enforcement is guided by officials' personal views rather than any consistent standard. Rule 3.06(d)'s "harass" provision can be construed to avoid this unpredictability and standardlessness. We have looked for guidance to statutes, in particular criminal stalking statutes, containing definitions of the word "harass" that have withstood vagueness challenges. These definitions consistently include the following elements: (1) a course of conduct, (2) directed at a specific person or persons, (3) causing or tending to cause substantial distress, and (4) having no legitimate purpose. See Snowden v. State, 677 A.2d 33, 36 (Del.1996) (quoting 11 DEL.CODE § 1312A(b)(1)); Bouters v. State, 659 So.2d 235, 236 (Fla.1995) (quoting FLA. STAT. § 784.048(1)(a)); Johnson v. State, 264 Ga. 590, 449 S.E.2d 94, 96 (1994) (quoting GA. CODE § 16–5–90); State v. Fonseca, 670 A.2d 1237, 1238 (R.I.1996) (quoting R.I. GEN. LAWS § 11–59–1(2)); see also Luplow v. State, 897 P.2d 463, 465 (Wyo.1995) (quoting WYO. STAT. § 6–2–506(a)(ii)) (lacking "no legitimate purpose" element). The cited cases have held that thus defined, "harass" is not impermissi-

---

5. See CAL. R. PROF. COND. 5–320(D); ME.CODE PROF. RESP. R. 3.7(f)(2); MASS R. PROF. COND. 3.5(d).

bly vague even in a criminal statute, where the Constitution requires more specificity than in a civil regulation such as a disciplinary rule.[6] *See Village of Hoffman Estates,* 455 U.S. at 498, 102 S.Ct. 1186. In order to save Rule 3.06(d)'s "harass" provision from any suggestion of vagueness, we construe it as incorporating the above-stated definition.

Because Benton did not engage in a course of conduct—that is, repeated communications—directed at any individual, but merely sent a single letter to each discharged juror, he did not violate the "harass" provision of Rule 3.06(d) as we have interpreted it. We need not decide whether this provision would be unconstitutionally vague as applied to communications that fall within our limiting construction but that occurred before we announced the construction.

### D

We agree with Benton, however, that "embarrass" is fatally vague. Unlike "harass," "embarrass" is a term seldom used and, to our knowledge, never defined in statutory law. Although we have found no authority discussing the constitutionality of the word "embarrass," we believe it is comparable to "annoy." The Supreme Court held in *Coates* that the word "annoy" was unconstitutionally vague, "not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all." *Id.* at 611 n. 1, 614, 91 S.Ct. 1686. Similarly, the problem is not that one cannot understand what "embarrass" means in the abstract, but that one cannot tell with any sort of accuracy what speech will trigger embarrassment in the 'average' listener. Thus, Rule 3.06(d)'s "embarrass" provision runs afoul of the notice aspect of the vagueness doctrine, because "men of common intelligence must necessarily guess" at what speech might embarrass a juror. *Id.* It likewise implicates the doctrine's concern with arbitrary enforcement,

being so "standardless" that the Commission can only look to its own "personal predilections" to determine whether an attorney's speech is embarrassing. *Smith,* 415 U.S. at 575, 94 S.Ct. 1242. Because embarrassment varies so greatly between individuals and is so uniquely difficult to foresee, it is not susceptible to an objective ordinary person test; therefore, Rule 3.06(d)'s requirement of "calculated" conduct does not save this provision from vagueness. *Cf. Kramer,* 712 F.2d at 178 (holding that even "an intent element does not save ['annoy' or 'alarm'] from vagueness because the conduct which must be motivated by intent, as well as the standard by which that conduct is to be assessed, remain vague").

### E

■■■■ The phrase "influence [the juror's] actions in future jury service" consists of "terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with." *Broadrick,* 413 U.S. at 608, 93 S.Ct. 2908. Prohibitions on attempts to influence another's conduct are common in the law, *see, e.g.,* TEX. PEN.CODE § 32.43; *id.* § 36.04, and other courts have upheld them against vagueness challenges. *See United States v. Pommerening,* 500 F.2d 92, 97 (10th Cir.1974); *State v. Torline,* 215 Kan. 539, 527 P.2d 994, 997 (1974). The widespread use of this term in other statutes, although certainly not conclusive on the vagueness question, "is evidence that the term[ ] ha[s] a generally accepted meaning, and [is] not constitutionally suspect." *CISPES v. Federal Bureau of Investigation,* 770 F.2d 468, 476 n. 8 (5th Cir.1985). Rule 3.06(d)'s "influence" provision by its terms deals only with speech calculated to affect the hearer's actions in the limited context of jury service. We are satisfied that both the lawyers subject to the rule and the Commission officials charged with enforcing it can understand what kinds of communications

---

6. In the case of some, but not all, of these statutes, this difference in the standard of review is negated by the fact that the statute regulates conduct rather than speech. *Compare Snowden,* 677 A.2d at 36 n. 1 (describing stalking statute as "not affecting First Amendment rights"), *with*

*Luplow,* 897 P.2d at 468 (describing stalking statute as permissible content-neutral restriction on speech). *See generally Smith,* 415 U.S. at 573, 94 S.Ct. 1242 (stating that statutes capable of reaching protected speech are reviewed more strictly for vagueness than other statutes).

are reasonably likely to influence an ordinary juror's actions in future jury service.

JUSTICE BAKER contends in his dissenting opinion that the "influence" clause is vague because there is room for disagreement about whether it applies to certain communications such as thank-you notes. In so arguing, he sets an impossibly high standard of precision which, if generally applied, would render most legislation void for vagueness. "Condemned to the use of words, we can never expect mathematical certainty from our language." *Grayned*, 408 U.S. at 110, 92 S.Ct. 2294. Courts and juries are constantly called on to determine whether the facts of a given case fall within the terms of a statute, and often reasonable minds can differ about whether they do. Without doubt, "the imagination can conjure hypothetical cases in which the meaning of these terms will be [a] nice question." *CISPES*, 770 F.2d at 477 (alteration in original) (quoting *American Communications Ass'n v. Douds*, 339 U.S. 382, 412, 70 S.Ct. 674, 94 L.Ed. 925 (1950)). But such uncertainties of application are a natural part of the rule of law, whereby society first formulates generally applicable standards of conduct and then decides whether a defendant's specific acts violate those standards. They are not a mark of unconstitutionality.

In addition, JUSTICE BAKER points to the Commission's failure to enforce Rule 3.06(d) against a letter written by Benton's opposing counsel as proof of the "influence" provision's vagueness. At the hearing on Benton's punishment, Thomas Clay Hollis, the attorney who represented the defendants in the underlying personal injury suit, testified that he wrote the discharged jurors a letter in which he thanked them for their service and "tr[ied] to encourage future jury service." [7] We do not agree that a letter simply encouraging the performance of civic duty, without regard to how the juror will vote in future cases, is calculated to "influence [a dis-charged juror's] actions in future jury service" within the meaning of Rule 3.06(d). Even if another attorney had violated the rule without punishment, it is within the Commission's discretion to save its enforcement resources for those violations that, like Benton's, are most likely to have the harmful effects we discussed in Part II such as discouraging jury service and intimidating jurors. Finally, JUSTICE BAKER's criticism assumes that if selective enforcement occurred in this case, which we reject, it must have been caused by a defect in the rule. But the correct question for vagueness purposes is whether the statute's language is so unclear that it "encourages," *Kolender*, 461 U.S. at 361, 103 S.Ct. 1855, or is "an obvious invitation to" arbitrary enforcement. *Coates*, 402 U.S. at 616, 91 S.Ct. 1686. Any uncertainty in the phrase "influence [the juror's] actions in future jury service" does not rise to this level.

**F**

The unconstitutionality of one part of a statute does not require us to invalidate the entire statute unless the unconstitutional provision is not separable from the remainder. *See Harris County Water Control & Improvement Dist. No. 39 v. Albright*, 153 Tex. 94, 263 S.W.2d 944, 947 (1954); *Black v. Dallas County Bail Bond Bd.*, 882 S.W.2d 434, 437 (Tex.App.—Dallas 1994, no writ). The Disciplinary Rules of Professional Conduct contain a severability clause stating that the invalidation of any part of the rules "shall not affect any other provision ... of these rules that can be given effect without the invalid provision." TEX. DISC. R. PROF. COND. 9.01. Rule 3.06(d)'s prohibitions on speech calculated to "harass" or "influence" can be given effect without regard to the "embarrass" provision; the rule "present[s] an independent, complete and workable whole without" the unconstitutional term.[8] *Harris*

---

7. This testimony appears in a bill of exception made by the Commission. The trial court sustained Benton's objection to Hollis as a witness on the ground that the parties and the court had agreed not to go into the facts of the underlying personal injury suit. The Commission did not challenge the exclusion of Hollis's testimony on appeal. Nevertheless, since the parties' briefs, the court of appeals, and JUSTICES GONZALEZ and BAKER have all addressed Hollis's testimony, we will consider it as well.

8. Indeed, the American Law Institute's forthcoming Restatement takes just this form, barring post-verdict communications "that would *harass* the juror or constitute an attempt to *influence* the

*County Water Control*, 263 S.W.2d at 947. Except for the words "or embarrass," Rule 3.06(d) is constitutional and remains in effect.

## VI

The final issue before us is how our narrowing construction of "harass" and our holding that "embarrass" is unconstitutionally vague affect the trial court's judgment. When a defendant successfully challenges a law as unconstitutionally vague on its face, "it may not be applied to him ..., until or unless a satisfactory limiting construction is placed on the statute." *Gooding*, 405 U.S. at 521, 92 S.Ct. 1103 (quoting *Coates*, 402 U.S. at 620, 91 S.Ct. 1686 (White, J., dissenting)). We have limited Rule 3.06(d) so as to render it constitutional by striking the term "embarrass" and narrowing the term "harass." Thus, under *Gooding* we may apply the corrected rule to Benton. We must first determine, however, whether such an application is consistent with the trial court's findings.

The Commission's disciplinary petition and the findings contained in the trial court's judgment state only that Benton violated Rule 3.06(d), without specifying which of the rule's three provisions was involved. Although there is no evidence that Benton's conduct violated the "harass" provision as we have interpreted it, the trial court's finding that he violated the rule may stand as long as an alternative basis for that finding is supported by the evidence. *See Griffin v. United States*, 502 U.S. 46, 56, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991). However, when a defendant is convicted under a law prohibiting several acts in the alternative and one of those prohibitions is held unconstitutional on appeal, the conviction cannot stand if it "may have rested on [the] unconstitutional ground." *Bachellar v. Maryland*, 397 U.S. 564, 571, 90 S.Ct. 1312, 25 L.Ed.2d 570 (1970). Thus, a reviewing court must examine the record to determine whether there is a possibility that the factfinder based the conviction solely on the invalid rather than the valid portion of the law. *See id.* at 570,

90 S.Ct. 1312 (detailing conflicting testimony about defendants' conduct and concluding that "*on this record*, we find that petitioners may have been found guilty ... *simply* because they advocated unpopular ideas. Since conviction on this ground would violate the Constitution, it is our duty to set aside petitioners' convictions") (emphasis added); *Stromberg v. California*, 283 U.S. 359, 368, 51 S.Ct. 532, 75 L.Ed. 1117 (1931) (noting that prosecutor urged jury to convict based solely on the provision that was held unconstitutional and reversing conviction because "it cannot be determined *upon this record* that the appellant was not convicted under [the unconstitutional] clause") (emphasis added).

This is not a case in which "[i]t is impossible to say ... that [the constitutionally valid provision] was the basis for the verdict." *Bachellar*, 397 U.S. at 571, 90 S.Ct. 1312. Despite the absence of specific findings in the judgment, the record shows unambiguously that the trial court found that Benton violated Rule 3.06(d)'s "influence" clause. At the summary judgment hearing, the following discussion took place:

> COMMISSION'S COUNSEL: [I]t's my understanding that the Court is releasing the jury with the understanding that Mr. Benton stipulates he did indeed violated [*sic*] Rule 3.06(d) and, therefore, there is no fundamental issue that needs to be determined by the jury. Is that correct?
>
> THE COURT: Is that correct?
>
> BENTON: Yes, that's correct.
>
> BENTON'S COUNSEL: He has made that known in his affidavit and summary judgment, Your Honor. That's no problem.
>
> THE COURT: I took it as a judicial admission in the pleadings that were on file. So there will be no necessity for a jury determination.

Benton's pleadings admit only that he violated the "influence" provision.[9] As the excerpt

---

juror's actions as a juror in future cases," but making no reference to "embarrassment." RE-STATEMENT OF THE LAW GOVERNING LAWYERS § 175(3)(a) (Tentative Draft No. 8, 1997) (emphasis added).

9. Benton's motion for summary judgment states: "Respondent has admitted that he violated Texas Disciplinary Rules of Professional Conduct 3.06(d) *in that he communicated with members of the jury by letter to influence their actions in*

from the hearing shows, the trial court accepted this admission and dismissed the jury, expressly announcing that no factual determination would be needed. Therefore, the trial court cannot have based its finding that Benton violated Rule 3.06(d) on either the "harass" or the "embarrass" provision, because that would have required resolution of a disputed fact issue. On this record, the trial court's finding that Benton's letter violated the rule may be upheld because there is no possibility that it was based on the unconstitutionally vague term "embarrass."

However, it appears from the record that the trial court may have considered the "harass" and "embarrass" provisions of the rule at the punishment stage of the proceedings. The trial court held a hearing to determine the appropriate sanction for Benton's violation. *See* Tex.R. Disc. P. 3.10. The record contains the following discussion of the evidence to be presented at that hearing:

> BENTON'S COUNSEL: Judge, if I may, if Mr. Benton has admitted to violating the rule, what relevancy would the jurors have as to punishment, their testimony? ...
>
> THE COURT: I think just to show that there was in fact embarrassment and they considered it harassing. I would assume that's the purpose of it.

The Commission elicited testimony at the punishment hearing that some of the jurors felt "harassed" and "mortified" by Benton's letter. We do not suggest that the trial court should not have considered this testimony, nor that the sanction it imposed was excessive. On the contrary, the jurors' testimony was highly relevant to some of the factors that the court was required to consider in determining Benton's punishment for violating the "influence" clause, such as "[t]he nature and degree of the Professional Misconduct" and "[t]he maintenance of respect for the legal profession." Tex.R. Disc. P. 3.10(A), (I). But since it is possible that

the trial court increased the punishment based on the belief that Benton's letter violated all three provisions of Rule 3.06(d) instead of only one, justice demands that we remand this cause to give the parties an opportunity to present argument to the trial court on how, if at all, our holdings today affect the previously imposed punishment.

For the foregoing reasons, we reverse the judgment of the court of appeals and remand this cause to the trial court for a new hearing on punishment.

ENOCH, Justice, filed a concurring and dissenting opinion, in which HECHT and OWEN, Justices, joined.

GONZALEZ, Justice, filed a dissenting opinion.

BAKER, Justice, filed a dissenting opinion, in which SPECTOR, Justice joined, and in Parts I and II of which GONZALEZ, Justice, joined.

ENOCH, Justice, joined by HECHT and OWEN, Justices, concurring in part and dissenting in part.

I share the plurality's view that Rule 3.06(d) does not violate state or federal constitutional guarantees of free speech and equal protection. I disagree, however, that the Rule is vague in any respect. Thus, I join only in Parts I through V(B) and Part V(E) of the plurality opinion. I would reverse the court of appeals' judgment and render judgment as it was originally rendered by the trial court. I concur in the Court's judgment only to the extent that it permits Benton to be disciplined under Rule 3.06(d).

Correctly, the plurality concludes that the word "calculated" "modifies all three of the challenged verbs, 'harass,' 'embarrass,' and 'influence.' " [1] Also correctly, the plurality then defines the term "calculated" as creat-

---

*future jury service."* (emphasis added). Benton's affidavit, filed as an attachment to the motion for summary judgment, states that "[t]he thrust of my letter of February 20, 1992, was not to 'merely harass' the jurors, but indeed *to influence them in future jury service."* (emphasis added). His summary judgment brief states: "[The Commission] correctly claimed that [Benton] violated

Rule 3.06(d) of the Texas Disciplinary Rules of Professional Conduct by sending the jurors a letter which was *'calculated ... to influence [their] actions in future jury service.' "* (omission in original) (emphasis added).

1. 980 S.W.2d at 438.

ing an "objective reasonableness standard." [2] A vagueness analysis questions whether the regulation is "set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with." [3]  Unlike the statute in *Long v. State,* and unlike the other cases cited by JUSTICE BAKER, Texas Disciplinary Rule of Conduct 3.06(d) incorporates an objective reasonableness standard for determining whether the "ordinary attorney" would believe that his conduct was "objectively likely to" harass, embarrass, or influence jurors. [4]

The inclusion of the "calculated to" language in Rule 3.06(d) "defin[es] the prohibited speech in terms of what effect an ordinary lawyer would expect the speech to have" and "assuages the vagueness doctrine's concern with whether 'men of common intelligence must necessarily guess at [the statute's] meaning.'" [5]  Therefore, Rule 3.06(d) survives Benton's vagueness challenge. [6]

But the plurality, while recognizing this objective reasonableness standard, unnecessarily proceeds to define "harass." [7]  It then compounds its error by concluding that the word "embarrass" is unconstitutionally vague. [8]  The plurality should have rejected Benton's facial vagueness challenge outright. Regarding the word "harass," the plurality should have avoided its foray into statutes

from other jurisdictions, especially when those statutes address an entirely different subject matter. [9]  Furthermore, as for the word "embarrass," the plurality misses the point when it states that "the problem is not that one cannot understand what 'embarrass' means in the abstract, but that one cannot tell with any sort of accuracy what speech will trigger embarrassment in the 'average' listener." [10]

The issue in this case is whether the speaker's actions were "objectively likely to" harass or embarrass the listener. [11]  Whether a listener might be, or actually was, harassed or embarrassed is only indirectly relevant.  If, under the objective reasonableness standard articulated by the plurality today, the speech was "calculated merely to harass or embarrass," then the rule is violated.  The question is whether an objectively reasonable lawyer would think his or her conduct was "likely to" cause harassment or embarrassment and whether the purpose of that communication was "merely" to enhance the likelihood that such harassment or embarrassment would occur. [12]

Finally, this Court's rules should be treated like statutes and should be governed by the same rules of interpretation and construction. [13]  We are to make every effort to save a statute or rule from constitutional

---

2. *Id.* at 439.

3. *United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers,* 413 U.S. 548, 579, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973); *see also Howell v. State Bar,* 843 F.2d 205, 208 (5th Cir.1988) (noting that a vagueness challenge is informed by context and that in reviewing an attorney disciplinary rule, one may take into account the special knowledge and experience that lawyers possess).

4. *See* 980 S.W.2d at 439. *Compare* TEX. DISC. R. PROF. COND. 3.06(d), *with Long v. State,* 931 S.W.2d 285, 288 (Tex.Crim.App.1996) (considering Texas stalking statute and noting that it lacked an objective standard), *and State v. Bryan,* 259 Kan. 143, 910 P.2d 212, 218 (1996) (considering Kansas stalking statute and noting that it lacked an objective standard).

5. 980 S.W.2d at 437 (quoting *Coates v. City of Cincinnati,* 402 U.S. 611, 614, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971) (quoting *Connally v. General Constr. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926))).

6. *See* 980 S.W.2d at 439 ("While statutes that '[d]o not indicate upon whose sensitivity a violation ... depend[s]' are likely to run afoul of the vagueness doctrine, a restriction banning only 'what men of common intelligence would understand would be words likely to cause [harm]' is less objectionable.") (quoting *Coates,* 402 U.S. at 613 and n. 3, 91 S.Ct. 1686) (citations omitted).

7. 980 S.W.2d at 439.

8. *Id.* at 440.

9. *Id.* at 440.

10. *Id.* at 440.

11. *Id.* at 440.

12. TEX. DISC. R. PROF. COND. 3.06(d).

13. *See, e.g., Hidalgo, Chambers & Co. v. F.D.I.C.,* 790 S.W.2d 700, 702 (Tex.App.—Waco 1990, writ denied).

infirmity.[14] The plurality articulates an objective reasonableness standard that girds Rule 3.06(d) against Benton's vagueness challenge. Proceeding further to define the word "harass" and declare the word "embarrass" unconstitutionally vague is jurisprudentially unwarranted and unsound.

The trial court correctly enforced Rule 3.06(d), and the court of appeals erred in reversing the judgment. I therefore agree with the plurality that the court of appeals' judgment should be reversed, and I concur in the Court's judgment only insofar as it permits the trial court to discipline Benton.

GONZALEZ, Justice, dissenting.

Today the Court announces that the free speech clauses of the United States and Texas Constitutions do not permit a lawyer to privately confront and criticize jurors for rendering an unfavorable verdict. In a recent opinion this Court acknowledged that "[c]ommunication sometimes requires confrontation." *Operation Rescue v. Planned Parenthood,* 975 S.W.2d 546, 555 (Tex.1998). I would hold that while the courts and the bar should discourage the crassness exhibited by the lawyer in this case, the disciplinary enforcement of Rule 3.06(d) infringes on constitutionally protected speech.

A majority of the Court realizes that Rule 3.06(d)'s prohibition on "comments to a member of [a discharged] jury that are calculated merely to ... embarrass" is unconstitutional. *See* TEX. DISCIPLINARY R. PROF. CONDUCT 3.06(d). The "embarrass" provision is not only vague, but also an impermissible restriction on constitutionally protected speech. "Speech does not lose its protected character ... simply because it may embarrass others or coerce them into action." *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 910, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982).

For similar reasons, the Court's counterintuitive construction of Rule 3.06(d)'s prohibition on "comments ... calculated merely ... to influence [a discharged juror's] actions in future jury service" is unconstitutional. *See*

TEX. DISCIPLINARY R. PROF. CONDUCT 3.06(d). Speech retains its protected character not just when it is embarrassing, but also when it is confrontational, obnoxious, and insulting. *See Claiborne Hardware,* 458 U.S. at 921, 102 S.Ct. 3409 ("To the extent that the court's judgment rests on the ground that ... citizens were 'intimidated' by 'threats' of 'social ostracism, vilification, and traduction,' it is flatly inconsistent with the First Amendment."). Because the Court concludes otherwise, I dissent.

I

Benton's letter was a personal, political commentary on a jury verdict in the context of a highly charged debate over lawsuit abuse. Benton's letter confronted the jurors for, as he perceived it, ignoring the facts and succumbing to the influences of the Campaign Against Lawsuit Abuse in entering a take-nothing verdict. Like other members of the bar, Benton believed that the campaign's disparagement of excessive litigation influenced jurors to be predisposed against plaintiffs regardless of the merits of their case.

Speech concerning public affairs is "at the core of the First Amendment," *Butterworth v. Smith,* 494 U.S. 624, 632, 110 S.Ct. 1376, 108 L.Ed.2d 572 (1990), because it is the "essence of self-government." *Garrison v. Louisiana,* 379 U.S. 64, 75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). The strong protections provided for political speech activities are robust even in the context of the regulation of lawyers. *See Florida Bar v. Went–For–It, Inc.,* 515 U.S. 618, 634, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995) ("There are circumstances in which we will accord speech by attorneys in public issues and matters of legal representation the strongest protection our Constitution has to offer."); *In re Primus,* 436 U.S. 412, 432, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978) (holding that punishing a lawyer for political expression "must withstand the 'exacting scrutiny applicable to limitations on core First Amendment rights'") (citation omitted).

14. *See* 980 S.W.2d at 439 (citing cases for the proposition that "we are bound to construe [a word] to avoid constitutional infirmity if possible"); *see also, e.g., Barshop v. Medina County*

*Underground Water Conservation Dist.,* 925 S.W.2d 618, 629 (Tex.1996); *Texas State Bd. of Barber Exam'rs v. Beaumont Barber College, Inc.,* 454 S.W.2d 729, 732 (Tex.1970).

The Commission argues that because Benton delivered his speech in a private letter to the jurors rather than to a public audience, his speech was not political. It characterizes Benton's letter as not a "free discussion of governmental affairs," but instead a "diatribe," "a personal attack on the integrity of the jurors and nothing more." The Commission would reserve the First Amendment's immunities to public speech, and deny those immunities to private, confrontational speech.

The Commission's minimalist theory of free speech is flawed. The Supreme Court's First Amendment analysis has generally started with a presumption that all speech is protected. It has found expression falling within only a few very narrow categories of speech to lack significant First Amendment protection. *See, e.g., Chaplinsky v. New Hampshire,* 315 U.S. 568, 573, 62 S.Ct. 766, 86 L.Ed. 1031 (1942) (fighting words); *Schenck v. United States,* 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919) (falsely shouting "fire" in a crowded theater); *New York v. Ferber,* 458 U.S. 747, 764, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982) (child pornography); *Miller v. California,* 413 U.S. 15, 20, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) (obscenity); *Beauharnais v. Illinois,* 343 U.S. 250, 266, 72 S.Ct. 725, 96 L.Ed. 919 (1952) (defamation). Even these generally proscribable categories have been strictly delimited. *See, e.g., City of Houston v. Hill,* 482 U.S. 451, 461, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987); *Lewis v. City of New Orleans,* 415 U.S. 130, 132, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974); *Cohen v. California,* 403 U.S. 15, 20, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (all narrowly construing the "fighting words" exception); *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 349, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) (qualifying the proscribability of defamation). While the Supreme Court has repeatedly emphasized that public or political speech is at the very core of First Amendment protection, *see, e.g., Meyer v. Grant,* 486 U.S. 414, 425, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988), this does not undercut the value of other forms of expression.

Even assuming Benton's letter does not qualify as classic political or public speech, it qualifies as moral suasion. Benton's letter to the discharged jurors, albeit caustic, challenged the jurors to change their personal attitudes about civil justice. Benton testified that although his letter was "way too aggressive," it was not his intention to harass or embarrass the jurors. He wished to confront the jury for what he believed was "its blatant disregard of the facts" and "unjust and wrongful decision." He was incensed that "despite the undisputed evidence of medical bills and lost wages ... the jury wrote zeroes in all the spaces provided."

If speech is to be valued in proportion to the extent to which it affects how people function, interact, and govern themselves culturally as well as politically, then moral suasion must be very near if not at the immediate core of the First Amendment's protection. Moral suasion frequently stings, but that is not necessarily bad. Speech that induces individuals to re-evaluate and perhaps modify their convictions serves as a cathartic against the vices of individualism. In his definitive treatise on early American democracy, Alexis de Tocqueville recognized the value of moral suasion to the American way of life:

> Nothing, in my opinion, is more deserving of our attention than the intellectual and moral associations of America. The political and industrial associations of that country strike us forcibly; but the others elude our observation, or, if we discover them, we understand them imperfectly, because we have hardly ever seen anything of the kind. It must, however, be acknowledged, that they are as necessary to the American people as the former, or perhaps more so.

ALEXIS DE TOCQUEVILLE, DEMOCRACY IN AMERICA 201–02 (Richard D. Heffner ed., New American Library 1956) (1840). Grass-roots activism, door-to-door proselytizing, and one-on-one appeals to moral values have preceded and nurtured nearly every major social change in American history.

Regrettably, society now exalts moral indifference as a public virtue and increasingly resists its agents of moral suasion. The popular sentiment that every individual is free to

choose his or her own philosophy and values has evolved into a cultural resentment against proselytizing and personal moral confrontation. Tocqueville warned that one of the greatest threats within a democracy was its tendency to foster indifference and separation among individuals, but he praised America for combating these tendencies with its free institutions. TOCQUEVILLE, *supra,* at 195. However, the battle against society's increasing insularity will be lost if the courts fail to protect the Constitution's most sacred institutions, namely, the freedoms of religion, speech, press, and association.

The Commission argues that Benton's letter was not entitled to the traditional immunities of political speech because it was personal rather than public, thereby invading their privacy. However, personal, one-on-one moral confrontation should not be segregated from the protections we recognize for classic public speech. "In a face-to-face encounter there is a greater opportunity for the exchange of ideas and the propagation of views...." *Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.,* 473 U.S. 788, 798, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). "Feelings and opinions are recruited, the heart is enlarged, and the human mind is developed, only by the reciprocal influence of men upon each other." TOCQUEVILLE, *supra,* at 200. "[T]he most effective, fundamental, and perhaps economical avenue of political discourse [is] direct one-on-one communication." *Meyer v. Grant,* 486 U.S. at 424, 108 S.Ct. 1886.

In several opinions spanning the major political movements of the twentieth century, the Supreme Court has vindicated the right of activists to pursue converts through focused confrontation and moral suasion. *See, e.g., American Steel Foundries v. Tri–City Cent. Trades Council,* 257 U.S. 184, 206–07, 42 S.Ct. 72, 66 L.Ed. 189 (1921) (recognizing the right of labor representatives to act as "missionaries," accosting strike-breakers as they attempted to enter or exit the plant); *Martin v. City of Struthers,* 319 U.S. 141, 145–49, 63 S.Ct. 862, 87 L.Ed. 1313 (1943) (striking down ordinance prohibiting door-to-door solicitation as applied to religious speech); *Organization for a Better Austin v. Keefe,* 402 U.S. 415, 416–20, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971) (upholding the right of neighborhood activists to organize community pressure against real estate agent who promoted white flight for private gain); *NAACP v. Claiborne Hardware,* 458 U.S. 886, 921, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982) (holding that even unpleasant forms of moral suasion—including " 'threats' of 'social ostracism, vilification, and traduction' "—are protected by the First Amendment); *Schenck v. Pro–Choice Network,* 519 U.S. 357, 117 S.Ct. 855, 870, 137 L.Ed.2d 1 (1997) (rejecting any "generalized [privacy] right to be left alone"). Even our own Court recently acknowledged that "[c]ommunication sometimes requires confrontation." *Operation Rescue v. Planned Parenthood,* 975 S.W.2d at 555.

The right to verbally confront the morality of one's attitudes or conduct is not limited to tactful commentary. "The right [of free speech] extends to the aggressive and disputatious as well as to the meek and acquiescent." *Martin v. City of Struthers,* 319 U.S. at 149, 63 S.Ct. 862 (Murphy, J., concurring). "Speech does not lose its protected character ... simply because it may embarrass others...." *Claiborne Hardware,* 458 U.S. at 910, 102 S.Ct. 3409. Freedom of speech should not depend on the court or the bar's judgment of the wisdom, polity, or prudence of a given communication. "Strong and effective extemporaneous rhetoric cannot be nicely channeled in purely dulcet phrases." *Id.* at 928, 102 S.Ct. 3409. "One of the prerogatives of American citizenship is the right to criticize public men and measures—and that means not only informed and responsible criticism but the freedom to speak foolishly and without moderation." *Baumgartner v. United States,* 322 U.S. 665, 673–74, 64 S.Ct. 1240, 88 L.Ed. 1525 (1944).

The content of speech cannot be regulated to protect the feelings of the targeted individual or the sensibilities of the public. "As a general matter, we have indicated that in public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide 'adequate "breathing space" to the freedoms protected by the First Amendment.' " *Boos v. Barry,* 485 U.S. 312, 322,

108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) (citation omitted). Jurors, as citizens and participants in the administration of justice, are entitled to no exemption from these burdens of the First Amendment.

In a footnote, the Court exculpates its construction of Rule 3.06(d) to prohibit personally offensive speech on the basis that the rule "is concerned not with protecting jurors' sensibilities as such, but with protecting the jury system from the harm that is likely to result from inappropriate attorney communications with discharged jurors." 980 S.W.2d at 433 n. 3. The Supreme Court rejected a similar argument in *Boos v. Barry* when it struck down a statutory provision prohibiting the display of any sign within 500 feet of a foreign embassy tending to bring that foreign government into public odium or disrepute. *See* 485 U.S. at 315, 108 S.Ct. 1157. Although it acknowledged the display clause's purpose—to prevent harm to international relations by protecting the dignity of foreign diplomats—the Court held that "[l]isteners' reactions to speech are not the type of 'secondary effects' " that justify restrictions on speech. *Id.* at 321, 108 S.Ct. 1157; *see also R.A.V. v. City of St. Paul,* 505 U.S. 377, 394 & n. 7, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (striking down hate-crimes ordinance even though it was aimed at preventing race-related violence and victimization); *Texas v. Johnson,* 491 U.S. 397, 412, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (protecting right to burn flag despite argument that it affected national security by demoralizing American troops).

## II

Benton wrote his letter to the jurors *after* they had been discharged. Therefore, it is improbable that his letter would have any impact in the pending retrial of his case. Accordingly, I would subject Rule 3.06(d) to the exacting scrutiny traditionally applied to sanctions against political speech. *See, e.g., Brandenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (per curiam).

Nevertheless, this Court chooses to apply *Gentile's* intermediate scrutiny standard, which was approved by a sharply divided Supreme Court, for restrictions on lawyer speech affecting a *pending* case. *See Gentile v. State Bar of Nevada,* 501 U.S. 1030, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991). Benton's letter, however, had no impact on any pending case.[1] The *Gentile* decision does not support the proposition that restrictions on a lawyer's communications with the members of a discharged jury are entitled only to intermediate scrutiny.

In *Gentile,* the Supreme Court held that the bar could restrict lawyers' extrajudicial statements posing a "substantial likelihood of materially prejudicing [an adjudicative] proceeding." *See id.* at 1076, 111 S.Ct. 2720 (opinion of Rehnquist, C.J.). There were two principle reasons the Supreme Court approved a lower standard for a lawyer's professional communications in a pending case than the "clear and present danger" test— the identity of the speaker and the timing of the speech. *See Standing Committee on Discipline v. Yagman,* 55 F.3d 1430, 1442 (9th Cir.1995). First, a lawyer is an "officer of the court" with privileged access to information and whose "extrajudicial statements pose a threat to the fairness of a pending proceeding." *Gentile,* 501 U.S. at 1074, 111 S.Ct. 2720. Second, extrajudicial comments in a pending case may be "likely to influence the actual outcome of the trial" or "prejudice the jury venire, even if an untainted panel can ultimately be found." *Id.* at 1075, 111 S.Ct. 2720. Underscoring the fact that the *Gentile* standard applies only to *pending* cases, the Court emphasized that "[t]he regulation of attorneys' speech ... merely postpones the attorneys' comments until after the trial." *Id.* at 1076, 111 S.Ct. 2720.

The interests that prompted the Supreme Court to legitimize the "substantial likelihood" standard for a lawyer's extrajudicial speech in pending cases are not present in this case. "The special considerations identi-

1. The fact that the underlying *Salas v. Abete* case was pending *retrial* when Benton wrote his letter is irrelevant to the Court's reasoning or my critique of it. There is no suggestion in the pro- ceedings below that Benton's letter poisoned the venire from which the second *Salas v. Abete* jury, if any, would be selected.

fied by *Gentile* are of limited concern when no case is pending before the court. When lawyers speak out on matters unconnected to a pending case, there is no direct and immediate impact on the fair trial rights of litigants." *Yagman,* 55 F.3d at 1443. Even in the event that a lawyer's intemperate remarks toward discharged jurors gain widespread notoriety, I believe that the remarks are unlikely to predispose future juries for or against a particular party. Finally, unlike the rule upheld in *Gentile,* Rule 3.06(d) does not merely *postpone* certain speech, but altogether prohibits it.

*Gentile* is factually similar in only one respect: an attorney's speech is at issue. I do not dispute that in many respects, attorneys must be held to a higher standard than the rest of the public. Because of their special access to discovery information and client confidences, they are limited in what they may disclose. As officers of the court, they must behave with dignity and decorum in the courtroom. But I disagree that a lawyer's status as an officer of the court justifies comprehensive restrictions on his or her speech. The United States Supreme Court has expressed similar doubts:

> [A]lthough the State undoubtedly has a substantial interest in ensuring that its attorneys behave with dignity and decorum in the courtroom, we are unsure that the State's desire that attorneys maintain their dignity in their communications with the public is an interest substantial enough to justify the abridgment of their First Amendment rights.

*Zauderer v. Office of Disciplinary Counsel,* 471 U.S. 626, 647–48, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985).

This Court's extension of the *Gentile* standard to speech that does not affect any pending case contrasts with the reluctance with which the United States Supreme Court approved the *Gentile* standard for speech affecting a *pending* case. Four of the justices objected to lowering the standard at all, even for pending cases. *See* 501 U.S. at 1054, 111 S.Ct. 2720 (opinion of Kennedy, J.) ("We have not in recent years accepted our colleagues' apparent theory that the practice of law brings with it comprehensive restrictions,

or that we will defer to professional bodies when those restrictions impinge on First Amendment freedoms."). This Court's extension of the *Gentile* standard to speech after the trial is also in tension with other cases recognizing that the First Amendment's strongest protections are restored after the trial comes to an end. *See, e.g., Patterson v. Colorado,* 205 U.S. 454, 463, 27 S.Ct. 556, 51 L.Ed. 879 (1907) (Holmes, J.) ("When a case is finished, courts are subject to the same criticism as other people."); *State Bar v. Semaan,* 508 S.W.2d 429, 432–33 (Tex.Civ.App.—San Antonio 1974, writ ref'd n.r.e.) (recognizing the First Amendment's protection of an attorney's derogatory statements against a judge made outside the course of judicial proceedings).

In choosing to rely on federal rather than state precedent, this Court ignores *Davenport v. Garcia,* 834 S.W.2d 4 (Tex.1992), in which we held that a trial court's gag order to prevent lawyers from speaking about a pending case violated the free speech guaranties of the Texas Constitution. We sometimes start our free speech analysis with the First Amendment when the federal standard is more refined and protective of speech than the state standard, or where the federal constitutional standard has been decided more recently than the state standard. *See, e.g., Operation Rescue,* 975 S.W.2d at 556. But in the instant case, *Davenport* is not only more protective of speech than *Gentile,* but also more recently decided than *Gentile.*

Although it is distinguishable in some respects, *Davenport,* like the instant case, involved a conflict between a court's interest in safeguarding the administration of justice and a lawyer's freedom of speech. *See* 834 S.W.2d at 6 ("Counsel in this case ... are expressly ORDERED to refrain from discussing or publishing ... any matters of this case with any persons other than their clients, agents, or employees...."). Seeking to prevent misstatements and misunderstandings that could threaten a proposed settlement and jeopardize the best interests of the minor plaintiffs, *see id.* at 28 (Hecht, J., concurring in the judgment), the trial court enjoined the attorneys, their clients, witnesses, agents and representatives from pub-

**450**

licly commenting on a toxic tort case outside of the courtroom. *See id.* at 6. This Court struck down the injunction as violating article I, section 8 of the Texas Constitution:

[A] gag order in civil judicial proceedings will withstand constitutional scrutiny only where there are specific findings supported by evidence that (1) an imminent and irreparable harm *to the judicial process* will deprive litigants of a just resolution of their dispute, and (2) the judicial action represents the least restrictive means to prevent that harm.

*Id.* at 10 (emphasis added).

In both *Davenport* and *Gentile*, our Court and the United States Supreme Court, respectively, decided the extent to which the federal "clear and present danger" standard enunciated in *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 562, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976), applied to a lawyer's extrajudicial statements affecting a pending case. In *Davenport*, we held that "[t]he standard enunciated in *Nebraska Press* ... does not ... sufficiently protect the rights of free expression that we believe that the fundamental law of our state requires." 834 S.W.2d at 10. In *Gentile*, by contrast, the United States Supreme Court explicitly rejected *Nebraska Press* as too demanding a standard for regulating the speech of lawyers. 501 U.S. at 1074, 111 S.Ct. 2720. The Court, however, believes that the tension between these very disparate standards is fully resolved by the fact that *Davenport* involved a prior restraint, whereas Rule 3.06(d) does not. 980 S.W.2d at 435.

In avoiding *Davenport*, the Court gives talismanic significance to the distinction between Rule 3.06(d) and a classic prior restraint. But elsewhere in its opinion, the distinction loses its significance in the Court's approval of several cases from other jurisdictions that uphold prior restraints—cases in which the same outcome would be doubtful under the *Davenport* standard. *See, e.g., United States v. Cleveland*, 128 F.3d 267, 270 (5th Cir.1997), *cert. denied*, — U.S. —, 118 S.Ct. 1518, 140 L.Ed.2d 670 (1998) (upholding a sweeping prior restraint on the right of the press to interview discharged jurors because a juror's fear of interviews

could affect its deliberations); *United States v. Antar*, 38 F.3d 1348, 1363 (3d Cir.1994) (upholding a prior restraint on juror interviews); *United States v. Moten*, 582 F.2d 654, 666 (2d Cir.1978) (modifying the district court's prior restraint on juror interviews).

While Rule 3.06(d) is not a quintessential prior restraint, it possesses the very characteristics courts have found so troubling with prior restraints. "The special vice of a prior restraint is that communication will be suppressed, either directly or by inducing excessive caution in the speaker, before an adequate determination that it is unprotected by the First Amendment." *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 390, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973). Unlike libel law, under which no penalty can be imposed unless the statement is objectively false, the line between acceptable and unacceptable communicative influences is poorly defined in both the text and the Court's interpretation of Rule 3.06(d).

The part of the Rule which the Court finds was violated by Benton's letter prohibits a lawyer from "ask[ing] questions of or mak[ing] comments to a member of that jury that are calculated merely ... to influence his actions in future jury service." TEX.R. DISCIPLINARY P. 3.06(d). *Black's Law Dictionary* defines the word "calculated" as "[t]hought-out, premeditated," and the word "influence" as "[t]o affect, modify or act upon by physical, mental or moral power, especially in some gentle, subtle, and gradual way." BLACK'S LAW DICTIONARY (6 th ed.1990).

At one point the Court suggests the Rule applies to speech *"attempt[ing]* to persuade jurors to favor *a particular lawyer, firm, or side of the docket* in future jury service." *See* 980 S.W.2d at 436 (emphasis added). So construed, the Rule would prohibit attorney communications specifically intended to ingratiate oneself with jurors to gain an advantage for oneself, one's firm, or one's clients in future cases. But later, the Court construes that the word "calculated" in the context of Rule 3.06(d) to mean objectively likely rather than intended. This is a startling construction. Whether informed by case law or common sense, an ordinary lawyer would proba-

bly understand the word "calculated" in the statute, followed by the modifier "merely," to require specific intent. *See Corson v. State*, 148 Tex.Crim. 630, 190 S.W.2d 726, 728 (1945) (holding that the word "willfully" in a criminal statute meant not only that the act was intended, but " 'that the means used by him were *calculated* to maim' ") (citation omitted) (emphasis added); John Schmolesky, *Criminal Law*, 38 Sw. L.J. 497, 506 n. 76 (1984) (equating "calculation" with "specific intent"). Also, even though the "influence" provision of Rule 3.06(d), on its face, seems directed to communications calculated to sway jurors in future cases, the Court focuses on the offensiveness of Benton's letter. Whether "calculated" means "intended" or simply "likely to," Rule 3.06(d)'s influence provision has been misapplied to Benton's letter.

I do not believe that there is any basis for characterizing Benton's letter as being *calculated*, that is, specifically intended, to predispose future jurors to a particular lawyer, firm, or side of the docket or to discourage them from future service. Benton admits that he attempted to *influence* the jurors in future cases, but not in *those* ways. Benton admits only that he intended to chastise the jurors for their decision and influence them to decide fairly in future cases.

Similarly, it would be presumptuous to impute self-serving motives to Thomas Clay Hollis, the attorney representing the defendant in the underlying case, who also wrote a letter to the jurors. Hollis's letter was respectful and courteous. It influenced the jurors to be willing to serve again.

If, however, the lawyers' motives are irrelevant, then it could be argued that Hollis's letter, like Benton's, had improper *effects* on the same jurors, making them more likely to favor him, his firm, or his clients in future cases. What is sauce for the goose is sauce for the gander. *See Lewis v. Peoples Savings and Loan*, 463 S.W.2d 284, 287 (Tex.Civ. App.—Austin 1971, writ ref'd n.r.e.).

The bane of Benton's letter was not that it influenced the jurors to be partial to one side or the other in a future case. The substantive evil of Benton's letter was its "abusive and insulting" character. 980 S.W.2d at 433.

Nowhere, however, does the "influence" provision distinguish "encouraging" speech from "abusive and insulting" speech. Both kinds of speech are undoubtedly influential, and both kinds of speech may be tainted with improper, self-serving motives.

In *Cox v. Louisiana*, 379 U.S. 536, 557–58, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965), the Supreme Court held that a broad prohibitory statute susceptible to selective enforcement was the equivalent of a statute "providing a system of broad discretionary licensing power"—the classic prior restraint. The Committee for Lawyer Discipline, with the Court's approval, acts like an administrative censor, selectively enforcing Rule 3.06(d) against speech it deems to negatively influence ex-jurors. *See Southeastern Promotions Ltd. v. Conrad*, 420 U.S. 546, 559, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) (condemning prior restraints because "the line between legitimate and illegitimate speech is often so finely drawn that the risks of freewheeling censorship are formidable"). These characteristics of Rule 3.06(d), which resemble those of a prior restraint, belie the Court's attempt to distinguish *Davenport*.

### III

Rule 3.06(d), however, does not withstand either the compelling interest test applicable to political speech or the substantial interest test of *Gentile*. While insulting remarks to the members of a discharged jury are repugnant, it is an exaggeration to hold that they are substantially likely to materially prejudice an adjudicative proceeding. Benton's letter to the discharged jurors did not threaten anyone's fair trial rights. It did not disrupt or burden any other court proceeding, much less his own. While Benton's letter justifiably offends this Court, it had at most a remote potential impact on the administration of justice.

When negotiating our citizens' precious First Amendment freedoms, courts should be careful not to overstate the supposed harms caused by the exercise of those freedoms. *Cf. Ex Parte McCormick*, 129 Tex.Crim. 457, 88 S.W.2d 104, 105 (1935) ("It appears to us that respondent *unduly stresses* the tenden-

cy of accurate newspaper reports of public trials to embarrass the administration of justice.") (emphasis added); *Abrams v. United States,* 250 U.S. 616, 630, 40 S.Ct. 17, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting) ("[W]e should be eternally vigilant against attempts to check the expression of opinions that we loathe and believe to be fraught with death, unless they so imminently threaten immediate interference with the lawful and pressing purposes of the law that an immediate check is required . . . ."). This is especially true where political speech is at issue. *See, e.g., In re Primus,* 436 U.S. at 434–36, 98 S.Ct. 1893 (holding that "[w]here political expression or association is at issue," proscriptions on lawyer speech cannot be justified by a "very distant possibility of harm"); *NAACP v. Button,* 371 U.S. 415, 443, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) (holding NAACP solicitation was constitutionally protected despite potential conflict of interest).

The Court reasons that a potential juror's mere anticipation of critical post-verdict speech poses a substantial likelihood of materially prejudicing *future* adjudicative proceedings. According to the Court, "the threat of verbal attacks by disappointed lawyers creates an atmosphere of intimidation during trial that can affect jurors' impartiality." 980 S.W.2d at 434.

Criticism, especially as harsh as Benton's, is often unpleasant. Criticism prompts a wide range of reactions, from remorse to anger and intimidation to indignation, as diverse as the personalities subjected to it. But the danger is far-fetched that all six or twelve members of a jury panel, aware of some attorney's tendency to verbalize his contempt for jurors, will be intimidated into reaching a verdict that avoids his or her criticism. It is common sense that acting contemptuously toward juries is more likely to diminish rather than enhance a lawyer's chances of gaining a favorable verdict. Indeed, the juror who testified of her reluctance to serve on future panels also stated that "[a]s a direct result of Benton's letter," she was "now supporting lawsuit abuse reform."

The Court's more plausible concern is that post-verdict speech critical of jurors discour-

ages them and others who hear of such diatribes from further jury service. But these evils are not without alternative remedies. The salutary speech of judges and other "officers" of the court may overcome the baneful influences of a lawyer's ill remarks. *See Whitney v. California,* 274 U.S. 357, 377, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring) ("If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the process of education, the remedy to be applied is *more speech, not enforced silence.*") (emphasis added). Moreover, the exercise of moral suasion from the bench and the bar will deter most other lawyers from imitating Benton's contemptuous behavior. *See Texas v. Johnson,* 491 U.S. at 419, 109 S.Ct. 2533 ("The way to preserve the flag's special role is not to punish those who feel differently [but] to persuade them that they are wrong."). Our federal and state constitutions protect Benton's right to ridicule others, but they also protect the rights of the public, the bar, and our courts to criticize him.

Even if the possibility of receiving a rude letter so deterred the population of potential jurors that no jury could be assembled, I am not convinced that it would justify a complete prohibition on such communications. *Cf. Gitlow v. New York,* 268 U.S. 652, 673, 45 S.Ct. 625, 69 L.Ed. 1138 (1925) (Holmes, J., dissenting) (arguing that free speech should prevail even if it finds its meaning and consequence in a proletarian dictatorship). In a similar vein, others have argued that communist speech discourages democratic values, *see Gitlow,* 268 U.S. at 667, 45 S.Ct. 625 (holding that communist speech was subversive of representative democracy), and that flag-burning is so demoralizing that it threatens national security. *See Texas v. Johnson,* 491 U.S. at 426, 109 S.Ct. 2533 (Rehnquist, J., dissenting) (discussing the demoralizing effect of flag desecration on American troops). But the speech of communists and flag-burners, however inconsistent with bedrock American values, has been protected. I cannot believe that Benton's letter poses any greater threat.

When a court considers whether to impose or enforce a prophylactic rule against speech,

it should at the very least discount the supposed gravity of the evil by its improbability. *See United States v. Dennis*, 183 F.2d 201, 212 (2d Cir.1950) (L.Hand, J.) ("In each case [a court] must ask whether the gravity of the 'evil,' discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger."), *aff'd*, 341 U.S. 494, 510, 71 S.Ct. 857, 95 L.Ed. 1137 (1951) (adopting Judge Hand's famous formula). It is extremely unlikely that Benton's letter, by itself, presents a substantial threat to the administration of justice. Such vitriol would have to be widely imitated to create a "substantial" threat to the jury system. However, this is equally improbable.

In his affidavit and at his disciplinary hearing, Benton stated that he wished he had never sent the letter, explaining:

> My position is, first of all, that I don't do myself—in a small community like this, I do not do myself any favors by writing angry, critical letters to jurors. Even if I believe they are wrong, I don't help myself at all by criticizing them, because they may be on a jury or they may be a future client. They may influence future clients.

The vast majority of lawyers have enough decorum and good sense not to antagonize jurors, even when they are upset with their verdicts. The trial judge in the underlying case, admitted to the bar in 1949, testified that in all of his years in practice and as a judge, only one other time had he encountered a lawyer who improperly contacted a juror. Attorneys who antagonize jurors undercut their professional reputation and economic self-interest, especially in a small community, so few can be expected to do so. Only a very pessimistic view of the bar justifies the belief that a prophylactic rule is necessary in order to stop others from repeating Benton's obnoxious example. *See Zauderer*, 471 U.S. at 648, 105 S.Ct. 2265 ("[W]e are unpersuaded that undignified behavior would tend to recur so often as to warrant a prophylactic rule."). We should employ moral suasion, not just legal rules, to deter attorneys from behavior unbecoming of the profession.

CONCLUSION

The Court's holding today strikes out part of Rule 3.06(d) but preserves the rule's sanction on "a substantial amount of expression that—however repugnant—is shielded by the First Amendment." *R.A.V.*, 505 U.S. at 413, 112 S.Ct. 2538 (White, J., concurring in the judgment). Five years ago a plurality of this Court wrote:

> Today our court continues to favor the growth and enhancement of freedom[,] not its constraint. The fact that vigorous debate of public issues in our society may produce speech considered obnoxious or offensive by some is a necessary cost of that freedom. Our Constitution calls on this court to maintain a commitment to expression that is strong and uncompromising for friend and foe alike.

*Ex Parte Tucci*, 859 S.W.2d 1, 8 (Tex.1993) (opinion of Doggett, J.). I hope today's opinion proves to be only a narrow exception to that trend.

I dissent.

BAKER, Justice, joined by SPECTOR and joined by GONZALEZ, Justices, as to Parts I and II, dissenting.

Today the Court holds that in some aspects Rule 3.06(d) is not void for vagueness. The Court concludes (1) that it can avoid holding "harass" vague by furthering defining the term, (2) that "embarrass" is facially vague, and (3) that "influence" is not vague. However, I believe that Rule 3.06(d) is unconstitutionally vague in all respects. Furthermore, because Rule 3.06(d) is unconstitutionally vague, and that conclusion disposes of the Commission's appeal, the Court should not reach Benton's First Amendment, Equal Protection, or overbreadth challenges. Because the Court concludes otherwise, I respectfully dissent.

## I. STANDARD OF REVIEW

It is a basic principle of due process that a statute or regulation is void for vagueness if it does not sufficiently identify the conduct that it prohibits. *See Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Unconstitutionally vague laws are void for three reasons: (1) to

avoid punishing people for behavior that they could not have known was forbidden; (2) to avoid subjective enforcement of laws based on arbitrary or discriminatory interpretations by government officials; and (3) to avoid any chilling effect on the exercise of free speech rights. *See Grayned,* 408 U.S. at 108–09, 92 S.Ct. 2294.

The traditional test for vagueness in regulatory prohibitions is whether the regulation is "set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest." *United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers,* 413 U.S. 548, 579, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973); *see also Howell v. State Bar,* 843 F.2d 205, 208 (5th Cir.1988) (reviewing the constitutionality of former Texas Disciplinary Rule 1–102(A)(5)); *Musslewhite v. State Bar,* 786 S.W.2d 437, 441 (Tex.App.—Houston [14th Dist.] 1990, writ denied) (reviewing the constitutionality of former Texas Disciplinary Rule 2–101). Also important is the particular context in which the regulation applies. *See Gentile v. State Bar,* 501 U.S. 1030, 1048, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991). Thus, when reviewing a disciplinary rule that only applies to attorneys, the "ordinary person" becomes the "ordinary lawyer." *See Howell,* 843 F.2d at 208. The ordinary lawyer is different because lawyers have "the benefit of guidance provided by case law, court rules and the 'lore of the profession.' " *Howell,* 843 F.2d at 208 (citing *In re Snyder,* 472 U.S. 634, 645, 105 S.Ct. 2874, 86 L.Ed.2d 504 (1985)).

In analyzing statutes or rules, courts draw distinctions between civil and criminal statutes. In general, there is "greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498–99, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). In Texas, disciplinary proceedings are civil in nature. *See State Bar v. Evans,* 774 S.W.2d 656, 657 n. 1 (Tex.1989). However, there is a competing interest that requires this Court to review Rule 3.06(d) under a higher standard than normally applied to civil regulations.

The United States Supreme Court has held that when a regulation is capable of interfering with a party's right to free speech, courts should "demand[ ] a greater degree of specificity than in other contexts." *Smith v. Goguen,* 415 U.S. 566, 573, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974); *see also Grayned,* 408 U.S. at 109 n. 5, 92 S.Ct. 2294. The Supreme Court has stated that "perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. If . . . the law interferes with the right of free speech . . . a more stringent vagueness test should apply." *Village of Hoffman Estates,* 455 U.S. at 499, 102 S.Ct. 1186.

While courts have repeatedly held that a lawyer's free speech rights can be restricted more than that of the ordinary person, this does not mean that the First Amendment does not constitutionally protect a lawyer's speech. *See Gentile,* 501 U.S. at 1071, 111 S.Ct. 2720. "[A] lawyer is a person and he too has a constitutional freedom of utterance and may exercise it to castigate courts and their administration of justice." *In re Sawyer,* 360 U.S. 622, 666, 79 S.Ct. 1376, 3 L.Ed.2d 1473 (1959) (Frankfurter, J., dissenting). Thus, though the state may regulate a lawyer's speech, his or her speech is nonetheless constitutionally protected speech.

Here, the Court recognizes that Rule 3.06(d) is capable of interfering with lawyers' free speech rights and that Benton's letter was political speech. 980 S.W.2d 436. And, though the Court concludes that Rule 3.06(d) is a constitutional regulation of speech, that does not change the fact that the Rule is capable of interfering with speech. Therefore, irrespective of the Rule's civil nature and irrespective of whether Rule 3.06(d) is a constitutionally permissible restriction on speech, the more stringent void-for-vagueness standard applies and greater degree of specificity is required. *See Smith,* 415 U.S. at 572–73, 94 S.Ct. 1242; *see also Gentile,* 501 U.S. at 1051, 111 S.Ct. 2720 (concluding that though a lawyer disciplinary rule was a constitutional restriction on speech, a more stringent void-for-vagueness standard applied because the rule prohibited speech).

The Commission argues that because Benton's conduct clearly violated Rule 3.06(d) and he admitted attempting to influence the jurors that this Court should preclude Benton from challenging Rule 3.06(d) for vagueness. The Commission relies on *Village of Hoffman Estates,* 455 U.S. at 495, 102 S.Ct. 1186, to support its argument. But, *Village of Hoffman Estates* did not involve a statute interfering with First Amendment rights. *Village of Hoffman Estates* states that "vagueness challenges to statutes *which do not involve First Amendment freedoms* must be examined in the light of the facts of the case at hand." *Village of Hoffman Estates,* 455 U.S. at 495 n. 7, 102 S.Ct. 1186 (emphasis added). However, the United States Supreme Court has held in other cases that when a statute purports to prohibit speech, a defendant may challenge it for vagueness though the statute is not vague as applied to the defendant's conduct. *See Kolender v. Lawson,* 461 U.S. 352, 358 n. 8, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983); *Gooding v. Wilson,* 405 U.S. 518, 521, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972); *Coates v. City of Cincinnati,* 402 U.S. 611, 619–20, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971) (White, J., dissenting). Otherwise, the "continued existence of the statute in unnarrowed form would tend to suppress constitutionally protected rights." *Coates,* 402 U.S. at 620, 91 S.Ct. 1686 (White, J., dissenting); *see also Gooding,* 405 U.S. at 521, 92 S.Ct. 1103.

## II. FACIAL VAGUENESS CHALLENGE

A statute or regulation is vague on its face not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all. As a result, "men of common intelligence must necessarily guess at its meaning."

*Coates,* 402 U.S. at 614, 91 S.Ct. 1686 (quoting *Connally v. General Constr. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926)).

Rule 3.06(d) provides:

After discharge of the jury from further consideration of a matter with which the lawyer was connected, the lawyer shall not ask questions of or make comments to a member of the jury that are calculated merely to harass or embarrass the juror or to influence his actions in future jury service.

TEX. DISCIPLINARY R. PROF'L CONDUCT 3.06(d) (1990).

Neither Rule 3.06(d) nor its comments define "harass," "embarrass," or "influence." Additionally, Texas courts have never interpreted Rule 3.06(d). Nationwide, nineteen other states have rules the same or similar to Rule 3.06(d).[1] However, only a few cases have applied or discussed the Rule. Of the cases that did discuss the Rule, none dealt with its constitutionality. *See Elisovsky v. State,* 592 P.2d 1221 (Alaska 1979); *Lind v. Medevac, Inc.,* 219 Cal.App.3d 516, 268 Cal. Rptr. 359 (Cal.Ct.App.1990); *In re Respondent A,* 1 Cal. State Bar Ct. Rptr. 255 (Cal. Bar Ct.1990); *In re Berning,* 468 N.E.2d 843 (Ind.1984); *State v. Socolofsky,* 233 Kan. 1020, 666 P.2d 725 (1983); *Commonwealth v. Solis,* 407 Mass. 398, 553 N.E.2d 938 (1990); *In re Hansen,* 318 N.W.2d 856 (Minn.1982); *Willoughby v. City of Oklahoma City,* 706 P.2d 883 (Okla.1985); *State v. Thomas,* 813 S.W.2d 395 (Tenn.1991); *State v. McCarter,* 1990 WL 166614 (Tenn.Crim.App.1990). Consequently, these cases provide little, if any, guidance.

The Commission has not offered any insight to interpreting the terms "harass," "embarrass," or "influence." Instead, the Commission simply claims that an ordinary lawyer should understand what each term means. Thus, I must look to the terms' ordinary meaning and the interpretation courts have given analogous regulations. *See Grayned,* 408 U.S. at 104, 92 S.Ct. 2294.

### A. HARASS AND EMBARRASS

*Black's Law Dictionary* defines "harassment" as "words, gestures and actions which tend to annoy, alarm and abuse (verbally)

---

1. Rule 3.06(d), as well as the similar rules in other states, is taken from the ABA Model Code of Professional Responsibility DR 7–108(D). All include the terms "embarrass," "harass," and "influence" without definitions.

another person." BLACK'S LAW DICTIONARY 717 (6th ed.1991). Generally, harassment is a course of conduct or repeated action. *See* BLACK'S LAW DICTIONARY 717 (6th ed.1991); WEBSTER'S NEW INTERNATIONAL DICTIONARY 1136 (2d ed.1960). The term "embarrass" implies some influence that makes one feel uneasy, usually in the presence of strangers. *See* WEBSTER'S NEW INTERNATIONAL DICTIONARY 835 (2d ed.1960). The problem with these definitions is that they are inherently vague. *See generally Kramer v. Price*, 712 F.2d 174, 178 (5th Cir.1983) (vacated on re-hearing after statute repealed) (stating that there is an inherent vagueness in attempting to define what annoys people). The definitions show that both "harass" and "embarrass" are based on an individual's subjective feelings. Thus, what might harass or embarrass one person may not harass or embarrass another. *See Coates*, 402 U.S. at 614, 91 S.Ct. 1686.

Other Texas statutes contain the terms "harass" or "embarrass." *See, e.g.,* TEX. FAM. CODE § 85.022 (protective orders); TEX. FAM. CODE § 156.005 (frivolous filing of suits for modifying parent-child relationship); TEX. FIN.CODE § 392.302 (debt collection); TEX. PEN.CODE § 42.07 (anti-stalking law and telephone harassment law). However, courts have not defined the terms as used in these statutes either.

Only one of these statutes has been attacked for vagueness—Texas Penal Code section 42.07—and the attacks were not based on any of the terms at issue in Rule 3.06(d). *See Long v. State*, 931 S.W.2d 285 (Tex.Crim.App.1996). In *Long*, the defen-

dant attacked the 1993 stalking statute, section 42.07(a) of the Texas Penal Code, claiming that it was unconstitutionally vague.[2] The Court of Criminal Appeals struck the statute down for vagueness, but specifically based its decision only upon the words "annoy" and "alarm." *See Long*, 931 S.W.2d at 289. The Court of Criminal Appeals reasoned that these terms were unconstitutionally vague because the statute (1) did not specify whose sensitivities had to be offended and (2) lacked an objective standard for measuring whether conduct was annoying or alarming. *See Long*, 931 S.W.2d at 288. While the Court of Criminal Appeals did not rule on the terms "harass" or "embarrass," it did state that they too "are susceptible to uncertainties of meaning." *Long*, 931 S.W.2d at 289.

Other courts have also struck down statutes for using the term "annoy" or "alarm." These cases are instructive because the terms "annoy" and "alarm" are included in the definition of harass. In *Coates*, 402 U.S. at 611, 91 S.Ct. 1686, the United States Supreme Court reviewed a statute that prohibited people from assembling and conducting themselves in an annoying manner.[3] The Supreme Court concluded that the term "annoy" did not provide a standard of conduct to which a person could conform and thus, the statute was vague. In essence, whether a person committed an offense depended on the sensitivities of some unknown person. *See Coates*, 402 U.S. at 614, 91 S.Ct. 1686. Likewise, the Fifth Circuit struck down a predecessor to section 42.07 because the

---

**2.** Former section 42.07 provided:

(a) A person commits an offense if, with intent to harass, annoy, alarm, abuse, torment, or embarrass another, he:

. . . .

(7)(A) on more than one occasion engages in conduct directed specifically toward the other person, including following that person, that is reasonably likely to harass, annoy, alarm, abuse, torment, or embarrass that person;

(B) on at least one of those occasions by acts or words threatens to inflict bodily injury on that person or to commit an offense against that person, a member of that person's family, or that person's property; and

(C) on at least one of those occasions engages in the conduct after the person toward whom

the conduct is specifically directed has reported to a law enforcement agency the conduct described by this subdivision.

Act of June 19, 1993, 73ʳᵈ Leg., R.S., ch. 900, § 1.01, 1993 Tex. Gen. Laws 3586, 3677–78, *amended by* Act of June 14, 1995, 74ᵗʰ Leg., ch. 657, § 1, 1995 Tex. Gen. Laws 3625, 3625. The court focused its vagueness analysis on section (a)(7)(A).

**3.** City ordinance § 901–L6 provided:

It shall be unlawful for three or more persons to assemble ... on any of the sidewalks, street corners, vacant lots, or mouths of alleys, and there conduct themselves in a manner annoying to persons passing by, or occupants of adjacent buildings.

CINCINNATI, OHIO, CITY ORDINANCES § 901–L6 (1956).

term "annoy" allowed enforcement officers too much discretion in determining what was annoying and provided *no notice to the common person* of what conduct the statute prohibits.[4] The Fifth Circuit, in line with other courts, was concerned that "annoy" was a subjective feeling and relied on the sensitivities of an unknown individual. *See Kramer,* 712 F.2d at 177–78.

Courts differ about whether the term "harass" is vague. In *State v. Bryan,* 259 Kan. 143, 910 P.2d 212 (1996), the Kansas Supreme Court held that the term "harass" as used in a stalking statute was vague.[5] The court reasoned that because the statute did not define the term "harass" in relation to an objective standard, the statute did not specify a standard of conduct. *See Bryan,* 910 P.2d at 218. Furthermore, the court noted that under a subjective standard one must ask: "Will this person whom I intend to follow be seriously alarmed, annoyed, or harassed by my act? If so, then a crime will be committed." *Bryan,* 910 P.2d at 220.

On the other hand, some courts have determined that the term "harass" is not vague. In *State v. Hoffman,* 149 N.J. 564, 695 A.2d 236 (1997), the New Jersey Supreme Court reviewed a harassment statute.[6] The defendant challenging the statute had been con-

victed for harassment because he tore up two child support orders and mailed the pieces to his ex-wife. In holding that the term "harass" was not vague, the court stated that "the specific state of mind required [by statute] ... serves to clarify any vague phrases...." *Hoffman,* 695 A.2d at 245. Additionally, the court noted that the statute specified the conduct that was prohibited. *Hoffman,* 695 A.2d at 245–46. The court was initially concerned that the phrase "any other manner likely to cause annoyance or alarm" was too broad. However, the court applied the concept of ejusdem generis and determined that the phrase was intended to prohibit conduct that would intrude upon a person's "legitimate expectation of privacy." *Hoffman,* 695 A.2d at 246. In reaching this conclusion, the court reasoned that the phrase was a general prohibition following specific prohibitions. Therefore, the phrase should be interpreted consistent with the specific prohibitions—proscribing interference with a persons right to privacy.

In *State v. Martel,* 273 Mont. 143, 902 P.2d 14 (1995), the Montana Supreme Court found that the term "harass" as used in a stalking statute was not vague because the statute included a specific mental state.[7] The court

---

4. The version of section 42.07 that the court reviewed in *Kramer* provided:

> (A) A person commits an offense if he intentionally:
> (1) communicates by telephone or in writing in vulgar, profane, obscene, or indecent language or in a course and offensive manner and by this action intentionally, knowingly, or recklessly annoys or alarms the recipient.

Act of January 1, 1974, 63 rd Leg., R.S., ch. 399, 1973 Tex. Gen. Laws 956, *amended by* Acts of September 1, 1983, 68 th Leg., R.S., ch. 411, 1983 Tex. Gen. Laws 2204.

5. Kansas statute 21–3438 provided:

> (a) Stalking is an intentional and malicious following or course of conduct directed at a specific person when such following or course of conduct seriously alarms, annoys, or harasses the person, and which serves no legitimate purpose.
> ....
> (d) For the purposes of this section, 'course of conduct' means a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose and which would cause a reasonable person to suffer substantial emotional distress, and must

actually cause substantial emotional distress to the person. Constitutionally protected activity *is not included within the meaning of 'course of conduct.'*

KAN. STAT. ANN. § 21–3438 (1994).

6. The statute provides:

> [A] person commits a petty disorderly person offense if, with the purpose to harass another, he:
> a. Makes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm.

N.J. STAT. ANN. § 2C:33–4 (West 1991).

7. Montana's statute provides:

> (1) A person commits the offense of stalking if the person purposely or knowingly causes another person substantial emotional distress or reasonable apprehension of bodily injury or death by repeatedly:
> ....
> (b) harassing, threatening, or intimidating the stalked person, in person or by phone, by mail, or by other action, device, or method.

stated that the United States Supreme Court has long recognized that "the requirement of a mental state to do a prohibited act may avoid those consequences to the accused which may otherwise render a vague or indefinite statute invalid." *Martel,* 902 P.2d at 19–20 (citing *Screws v. United States,* 325 U.S. 91, 101, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945)). In a similar case, a Pennsylvania state court reviewed Pennsylvania's stalking statute and reached the same conclusion. The court reasoned that a party who acts intentionally cannot claim confusion about what conduct the statute prohibits. *See Commonwealth v. Hendrickson,* 453 Pa.Super. 533, 684 A.2d 171, 178 (1996).

The United States Supreme Court has held that statutes lacking any objective standard do not give notice of the conduct prohibited and are open to arbitrary and discriminatory enforcement. *See Coates,* 402 U.S. at 614, 91 S.Ct. 1686; *accord Kramer,* 712 F.2d at 178.[8] Conspicuously missing from Rule 3.06(d) is a reasonable person or reasonable juror standard for determining what is harassing or embarrassing. The Rule prohibits a lawyer from communicating in a manner "calculated merely to harass or embarrass the juror." However, these terms deal with subjective feelings, and something that harasses or embarrasses one person may not necessarily harass or embarrass another. *See Coates,* 402 U.S. at 614, 91 S.Ct. 1686. That the Rule regulates lawyers does not make the terms any clearer because the law does not generally define the terms "harass" and "embarrass." Therefore, a lawyer can only rely on the terms' ordinary meanings and does not have any more of an advantage than the common person to know what may or may not harass or embarrass a person.[9] *See generally Gentile,* 501 U.S. at 1049, 111 S.Ct. 2720 (concluding that the terms "gener-

al" and "elaboration" did not have "settled usage or tradition of interpretation of in law. The lawyer has no principle for determining when his remarks pass from the safe harbor of general to the forbidden sea of elaborated.").

Further complicating matters is that Rule 3.06(d) does not state by whose sensitivities we judge the conduct. *See Coates,* 402 U.S. at 614, 91 S.Ct. 1686. An argument could be made that the comments to the Rule establish jurors as the persons upon whose sensitivities a violation depends. The comment makes a general statement that "[w]hen extrajudicial communication with a juror is permitted by law, it should be made … with deference to the personal feelings of the juror." TEX. DISCIPLINARY R. PROF. CONDUCT 3.06 cmt. 1. Yet, this comment seems to apply only to extrajudicial communication the Rule permits, not those that violate Rule 3.06(d). However, even if the Rule does establish that the Commission should use each particular juror's sensitivities to decide whether a lawyer has violated the Rule, there is still the problem that a violation relies on the subjective feelings of each discharged juror. The Rule simply does not establish any objective reasonable person or reasonable juror standard. *See Coates,* 402 U.S. at 613, 91 S.Ct. 1686.

The Court tries to bootstrap an objective standard into the Rule by concluding that the term "calculated" means likely. However, many cases have decided otherwise. These cases hold that the word's connotation of conscious analysis indicates that calculated refers to a specific mental state of knowledge or intent. *See Soweco, Inc. v. Shell Oil Co.,* 617 F.2d 1178, 1191 (5th Cir.1980); *Herrick v. Superior Court,* 188 Cal.App.3d 787, 233 Cal.Rptr. 675, 676 (1987); *Moody v. Hurri-*

---

MONT.CODE ANN. § 45–5–220.

8. The *Long* court did note that the absence of a reasonable person standard is not necessarily fatal to a statute's constitutionally. If a statute contains other provisions, such as setting out specifically prescribed conduct, the offense might be sufficiently defined to avoid vagueness. *See Long,* 931 S.W.2d at 291.

9. Courts have recognized that lawyers can determine what is "professional" conduct. *See In re*

*Snyder,* 472 U.S. at 645, 105 S.Ct. 2874. However, the situation Rule 3.06(d) presents is different. To determine what is professional conduct, a lawyer can rely on a written code of conduct and years of education. Under Rule 3.06(d) a lawyer is not given similar guidance. Rule 3.06(d)'s violation depends upon the subjective feelings of some unknown individual. Therefore, a lawyer can only base his decision on his own knowledge of human kind and what may harass or embarrass a person.

*cane Creek Lumber Co.*, 290 Or. 729, 625 P.2d 1306, 1310 (1981). I agree with these courts—the term "calculated" as used in Rule 3.06(d) means specific intent.

Statutes with a specific intent requirement can avoid a vagueness problem. However, that is not always the case. In *Smith*, the Supreme Court stated that irrespective of whether the statute required the prohibited conduct to be intentional or inadvertent, the statute still did not clarify the prohibited conduct. *Smith*, 415 U.S. at 578–81, 94 S.Ct. 1242. Along the same line, the Fifth Circuit held that "specifying an intent element does not save [a statute] from vagueness because the conduct which must be motivated by intent, as well as the standard by which the conduct is to be assessed, remains vague." *Kramer*, 712 F.2d at 178.

Importantly, the *Long* court noted that courts were more likely to determine that a specific intent requirement saved a statute from being vague when the First Amendment was not involved and courts reviewed the statute under a more deferential standard. *See Long*, 931 S.W.2d at 293 (discussing statutes that courts held not vague because of a specific intent requirement). In essence, when the First Amendment is implicated, courts are concerned with the possibility of chilling free speech and an intent requirement may not be enough to clarify vague terms. Thus, even with a specific intent requirement, people will steer far wider than necessary from the prohibited conduct. *See Grayned*, 408 U.S. at 109, 92 S.Ct. 2294.

Here, Rule 3.06(d) contains an intent requirement of "calculated to harass or embarrass." TEX. DISCIPLINARY R. PROFESSIONAL CONDUCT 3.06(d) (1990). Yet, as in *Smith* and *Kramer*, the intent requirement here does not clarify what "harass" or "embarrass" means and does not give a lawyer any more notice about what conduct would harass or embarrass a juror. *See Smith*, 415 U.S. at 579–82, 94 S.Ct. at 1250–51; *Kramer*, 712 F.2d at 178. The Rule still applies a subjective standard of conduct and does not specify

by whose sensitivities a lawyer's actions are judged. Moreover, Rule 3.06(d) directly prohibits speech. And as stated in *Long*, when free speech is involved an intent requirement is generally not enough to clarify vague terms. *See Long*, 931 S.W.2d at 293. Accordingly, Rule 3.06(d)'s intent requirement does not clarify the terms "harass" or "embarrass" and cannot be used to save the Rule from vagueness.

While courts have allowed certain restrictions on lawyers' speech, the rules regulating lawyers cannot be unconstitutionally vague. *See Gentile*, 501 U.S. at 1049–50, 111 S.Ct. 2720. Rule 3.06(d) does not state what conduct it considers harassing or embarrassing. Furthermore, the Rule does not set an objective standard for making that determination. Instead, a violation of Rule 3.06(d) rests entirely on the subjective feelings of some unknown person. Thus, Rule 3.06(d) is vague "not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all." *Coates*, 402 U.S. at 614, 91 S.Ct. 1686.

While the Court improperly concludes that "calculated" means likely, the Court still reaches the correct conclusion that "embarrass" is vague. However, the Court erroneously fails to recognize that "harass" suffers from the same pitfalls as "embarrass." Even assuming that the Court's definition of "calculated" is correct, the reasoning the Court applies to determine that "embarrass" is vague applies equally as well to the term "harass."[10] Just as with "embarrass," "harass" is an entirely subjective feeling. What may harass one person may not harass another. To avoid concluding that "harass" is vague the Court decides to borrow harassment definitions from statutes outside of this state. Yet, just because other states have had the foresight to define the term "harass" does not save this Rule from vagueness. Rather, the fact that the Court deemed it necessary to look to statutes with specific definitions evinces the fact that "harass" as

10. Interestingly, if the Court is correct that the term "calculated" means likely or intended, its conclusion simply adds to the Rule's vagueness problem. It is even more difficult for a person to determine what will "likely" harass or embarrass a juror.

used in Rule 3.06(d), without any definition, is vague.

More importantly though, the Court's added definition of "harass" also suffers severe vagueness problems. The Court borrows its definition from stalking statutes. These stalking statutes do not seek to regulate speech, but rather seek to regulate conduct. *See, e.g., Johnson v. State*, 264 Ga. 590, 449 S.E.2d 94, 96 (1994) (stating that the stalking statute does not prohibit conduct that is protected expression under the First Amendment); *State v. Fonseca*, 670 A.2d 1237, 1240 (R.I.1996) (stating that the defendant's First Amendment interests were not threatened by the statute). Thus, the statutes that the Court uses to create its definition of harassment were all reviewed under a standard different from that which applies in this case. As the Court of Criminal Appeals recognized: "If the First Amendment can be removed from the arena, a stalking statute can be evaluated under more deferential due process standards, and is thus more likely to survive scrutiny." *See Long*, 931 S.W.2d at 293. If Rule 3.06(d) regulated only conduct, the term "harass" may very well not have been vague.

Here though, Rule 3.06(d) regulates *speech.* As stated earlier this requires the Rule to have a higher degree of specificity. *See Smith*, 415 U.S. at 573, 94 S.Ct. 1242. In applying this heightened standard, the Court's new definition for "harass" is still vague. First, the term "distress" falls prey to the same inherent vagueness problems as "harass" and "embarrass." Simply, what may distress one person may not distress another. *See Coates*, 402 U.S. at 614, 91 S.Ct. 1686. Moreover, the statutes that the Court uses for creating its definition of "harass" either included specific conduct that would be considered harassing or provided an objective measure for determining what was harassing. *See Snowden v. State*, 677 A.2d 33, 36 n. 1 (Del.1996) (" 'Harass' means a knowing and willful course of conduct directed at a specific person which seriously alarms, annoys, or harasses the person, and which serves no legitimate purpose. The course of conduct must be such as would cause a reasonable person to suffer substan-

tial emotional distress, and must actually cause substantial emotional distress to the person.") (quoting 11 DEL.CODE § 1312A (b)(1)); *Johnson*, 449 S.E.2d at 95–97 (stating that the statute defines "harass" as "a knowing and willful course of conduct directed at a specific person which causes emotional distress by placing such person in reasonable fear of death of bodily harm to himself or herself or to a member of his or her immediate family . . . .") (quoting GA.CODE § 16–5–90); *Fonseca*, 670 A.2d at 1238 (" 'Harasses' means an knowing and willful course of conduct directed at a specific person which seriously alarms, annoys, or harasses the person and which services no legitimate purpose. The course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress, or be in fear of bodily injury.") (quoting R.I. GEN. LAWS § 11–59–1(2)); *Luplow v. State*, 897 P.2d 463, 465 (Wyo.1995) (" 'Harass' means to engage in a course of conduct including but not limited to verbal threats, written threats, vandalism or nonconsensual physical contact . . . .") (quoting WYO. STAT. § 6–2–506(a)(iii)). The Court's definition conspicuously lacks this specificity.

Second, and perhaps more dangerous, is the no legitimate purpose prong of the "harass" definition. *See Langford v. City of Omaha*, 755 F.Supp. 1460, 1464 (D.Neb.1989) (stating that the phrase "without purpose of legitimate communication" was unconstitutionally vague). Under this prong, the Commission is free to arbitrarily enforce the Rule because it can determine what communications are "legitimate" and what communications are not. Additionally, lawyers will be left to guess which communications serve a "legitimate purpose" and which communications do not. *See Langford*, 755 F.Supp. at 1464. The Constitution simply demands greater specificity. Accordingly, I do not believe that the Court's new definition of "harass" passes constitutional muster and thus it cannot save Rule 3.06(d) from vagueness.

## B. INFLUENCE

Rule 3.06(d) prohibits lawyers from communicating with discharged jurors in a man-

ner calculated "to influence [jurors'] actions in future service." TEX. DISCIPLINARY R. PROF'L CONDUCT 3.06(d) (1990). But again, the Rule does not state what conduct it prohibits. For example, in Texas state courts, it is common practice for attorneys to send letters to discharged jurors thanking them for their service. I know of no lawyer that has been disciplined for sending a letter of this nature, even though it is obvious that these letters are sent to influence jurors in future jury service. However, in at least one other jurisdiction, the term "influence" prohibits these types of letters. Under Virginia's rule precluding communication with jurors after their discharge, it is improper for a lawyer to send a letter to jurors thanking them for how they completed their service.[11] The Virginia Ethics Committee was concerned that such a letter might create at least the appearance that a party was attempting to influence jurors' future service. *See* VA.CODE OF LEGAL ETHICS AND UNAUTHORIZED PRACTICE, Le. Op. No. 415 & 416 (1993). Thus, even within the legal profession, lawyers do not agree about what conduct Rule 3.06(d) prohibits.

However, the major problem with the term "influence" is not its failure to give notice of what conduct the Rule prohibits, but instead the danger of arbitrary and discriminatory enforcement of the Rule. *See Kolender*, 461 U.S. at 357–58, 103 S.Ct. 1855 (quoting *Smith*, 415 U.S at 574, 94 S.Ct. 1242) ("Although the doctrine focuses both on actual notice to citizens and arbitrary enforcement, we have recognized recently that the more important aspect of the vagueness doctrine 'is not actual notice, but the other principle [sic] element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement.' "). When a statute fails to establish minimal guidelines for enforcement it is susceptible to arbitrary and discriminatory enforcement and is unconstitutionally vague. *See Gentile*, 501 U.S. at 1051, 111 S.Ct. 2720; *Grayned*, 408 U.S. at 108–09, 92 S.Ct. 2294; *Cox v. Louisiana*, 379 U.S. 536, 557–58, 85 S.Ct. 453

(1965). In particular, courts have continually warned legislatures that statutes regulating First Amendment rights must contain guidelines for enforcement. Without these guidelines there is a serious risk that enforcers will exercise their own form of censorship or viewpoint discrimination. *See, e.g., Kolender*, 461 U.S. at 358, 103 S.Ct. 1855 (stating that the Supreme Court was concerned with the potential for arbitrary suppression of First Amendment liberties); *Smith*, 415 U.S. at 575, 94 S.Ct. 1242 (stating that standardless statutes allow "policemen, prosecutors, and juries to pursue their personal predilections"); *Grayned*, 408 U.S. at 113 n. 22, 92 S.Ct. 2294 (stating that the Supreme Court has "condemned broadly worded licensing ordinances which grant such standardless discretion to public officials that they are free to censor ideas and enforce their own personal preferences"). Under a facial challenge "[t]he question is not whether discriminatory enforcement occurred here ... but whether the Rule is so imprecise that discriminatory enforcement is a real possibility." *Gentile*, 501 U.S. at 1051, 111 S.Ct. 2720. This case is an excellent example of how discriminatory enforcement under Rule 3.06(d) is in fact a reality.

Just like Benton, defense counsel in the underlying case sent a letter to the discharged jurors. His letter praised the jurors' efforts and encouraged them to serve as jurors again in the future. And just like Benton, the defense lawyer testified that he intended to influence the former jurors in future jury service. Two former jurors who testified for the Commission stated that the defense lawyer's letter was successful in influencing them to participate in future jury service. Yet, the Commission did not pursue disciplinary proceedings against the defense lawyer for his letter to the jurors. Moreover, the Commission called the defense lawyer as a witness against Benton. It is obvious that the Commission disciplined Benton merely because it did not like his letter's content. Thus, this case clearly illustrates "censorship through selective enforcement"

---

11. Virginia Disciplinary Rule 7–107(C) is exactly the same as Texas Rule 3.06(d) and states that "the lawyer shall not ask questions or make comments to a member of that jury that are calculated to merely harass or embarrass the juror or to influence his actions in future jury service." VA.CODE OF PROF'L RESPONSIBILITY DR 7–107.

**462** ■

and shows that discriminatory enforcement under Rule 3.06(d) is more than just a possibility. *See Gentile*, 501 U.S. at 1051, 111 S.Ct. 2720; *Grayned*, 408 U.S. at 108–09, 92 S.Ct. 2294. Because Rule 3.06(d) lacks any enforcement guidelines and provides an opportunity for obvious and disdainful viewpoint discrimination, it is unconstitutionally vague.

Today the Court not only sanctions the Commission's selective enforcement of Rule 3.06(d), but the Court itself engages in selective and arbitrary enforcement of the Rule. The Court begins with the improper premise that Rule 3.06(d) only punishes communications that are abusive and discourage future jury service. How the Court reaches this conclusion is beyond me. As stated above, the Rule does not define "influence." No case law defines the term either. The Rule proscribes communications "calculated merely ... to influence [the juror's] actions in future jury service." TEX. DISCIPLINARY R. PROF. CONDUCT 3.06(d) (1990). There is no qualifying language that states that the influence must be encouraging or discouraging. The Court's conclusion that the defense attorney's encouraging letter does not fall within Rule 3.06(d)'s parameters merely highlights the problems with Rule 3.06(d). The Rule provides no standards for determining the prohibited conduct. Thus, while Court may want letters similar to the defense's letter to fall outside the Rule's purview, the Rule is simply too vague to reach that conclusion.

Without more specificity about what the term "influence" means, lawyers will be left to guess about what the Commission will deem improper and will be forced to "steer far wider of the unlawful zone ... than if the boundaries of the forbidden area were clearly marked." *Grayned*, 408 U.S. at 109, 92 S.Ct. 2294 (internal quotations omitted). Thus, speech that is constitutionally permissible will necessarily be chilled. The Court's conclusion that Benton should have been punished for sending the letter does not save the Rule from the dangers of vagueness—the Commission has unfettered discretion to wield the mighty sword of censorship against those ideas that it finds offensive.

## III. CONCLUSION

I conclude that Rule 3.06(d) is unconstitutionally vague. Therefore, I would affirm the court of appeals without reaching Benton's other challenges. I regret that my view holds that a rule this Court promulgated is unconstitutionally vague, but a careful analysis of the Rule and the applicable law leaves no other alternative. Because the Court decides otherwise, I dissent.